STATE EX REL. GRAHAM ET AL., RELATOR, v. BOARD OF EXAMINERS ET AL., RESPONDENTS.

No. 9094.
Submitted November 15, 1951. Decided January 3, 1952.
239 Pac. (2d) 283.

Mr. Sam D. Goza, Jr., Helena, for appellants.

Mr. Arnold H. Olsen, Atty. Gen., Mr. Thomas F. Joyce, Mr. Louis E. Poppler, Asst. Attys. Gen., for respondents.

Mr. Goza, Mr. Olsen and Mr. Joyce argued orally.

MR. JUSTICE METCALF:

At the general election on November 7, 1950, the people of Montana voted for Initiative Measure No. 54, Laws 1951, p. 781, and after the canvass of the votes the Governor of Montana proclaimed it a law of the state.

As passed by the people under their reserved power of initia-

tive, the Act provides that: "In recognition and appreciation of the valor and devotion of the men and women who, by their military service, carried out and discharged the obligation of the State of Montana to contribute of its manpower to the defense of this republic in World War II, and in partial adjustment for the economic detriment suffered by them by reason of their service, the State of Montana hereby grants, and there shall be paid to, each resident of Montana who was in military service as a member of any branch of the military forces of the United States at sometime during World War II an honorarium, or adjusted compensation, of the sum of ten dollars ($10.00) for each month and major fraction of a month of such service within the continental limits of the United States, and the sum of fifteen dollars ($15.00) for each month and major fraction of a month of such service outside the continental limits of the United States."

To carry out the administrative details of the distribution of the honorarium, the Act defines various terms used therein; provides the procedure for applying for the honorarium; and authorizes the state board of examiners to adopt necessary rules and regulations for handling applications for the payment of the honorarium.

To raise the funds necessary to pay the honorarium, the Act authorizes the state board of examiners to issue bonds in the sum of 22 million dollars. These bonds "shall distinctly state that they are not and shall never be or become a general obligation of the State of Montana, but shall be payable only from the proceeds of a cigarette tax in the manner in.this law provided; shall contain the pledge of the State of Montana to continue to levy and collect the cigarette tax in this law provided for and place the proceeds thereof in the war veterans' compensation bond retirement fund, until all bonds issued hereunder, and the interest accruing thereon, shall have been paid * * *."

The revenue for the retirement of the bonds is to be raised by increasing the tax on cigarettes an additional two cents on

each package of 20 cigarettes, which tax is to be collected at the same time and in the same manner as the tax originally levied and imposed by Chapter 289, Laws of 1947, sec. 84-5606. The income from this additional tax is to be placed in a special fund known as the war veterans' compensation retirement fund, and shall be kept segregated from all other funds in the state treasury and shall be available solely for the payment of the bonds.

On January 4, 1951, the state board of examiners met and passed a resolution providing for the issuance of limited obligation bonds in the amount of $15,000,000 of the authorized $22,-000,000. On February 10, 1951, the appellants, taxpayers and cigarette smokers, filed this action in the district court of Lewis and Clark county and obtained a temporary restraining order restraining the sale of the bonds proposed to be issued in accordance with the resolution of the state board of examiners of January 4, 1951.

The attorney general appeared on behalf of the state board of examiners in the district court and interposed a general demurrer to the appellants' complaint. On April 6, 1951, the district court of Lewis and Clark county dissolved the temporary restraining order and sustained the demurrer. This appeal is from the judgment issued dismissing the complaint with prejudice.

The complaint sets forth two causes of action. The objections in the first cause of action are all directed against alleged defects in the petitions and irregularities in placing the measure on the ballot and voting thereon. Inasmuch as the action is before us on demurrer the allegations charging irregularities and defects in the petition are admitted and the question is whether these preliminary defects are without force or effect because of the subsequent election or the Act is nullified by such irregularities.

The initiative petition was filed in sections in the office of the secretary of state between May 25, 1950, and July 5, 1950. On the 7th day of July 1950 the secretary of state notified the

governor of Montana that a proposed petition for initiative had been filed in his office and certified that the petition contained a sufficient number of genuine signatures to entitle the measure to be placed upon the ballot and voted upon at the general election on November 7, 1950.

On July 27, 1950, in compliance with R. C. M. 1947, sec. 37-104, the governor issued a proclamation which announced that the petition had been filed and briefly stated its tenor and effect. This proclamation was published four times in newspapers throughout the state in accordance with the provisions of the statute.

On July 10, 1950, the attorney general submitted to the secretary of state a form of ballot to be used for the proposed initiative measure. On August 16, 1950, the secretary of state certified the general election ballot to the county clerks and recorders of the various counties including thereon the initiative measure which he had designated Initiative Measure No. 54.

At the election on November 7, 1950, 108,251 voters cast their ballots in favor of Initiative Measure No. 54, and 75,411 against it.

The appellants contend the petition was insufficient in the following respects:

1. Certificates of county clerks and recorders which fail substantially to comply with the requirements of R. C. M. 1947, sec. 37-103.

2. One hundred forty-nine signatures not certified in any manner which were counted by the secretary of state in arriving at the total number of valid signatures.

3. Signatures lacking identifying addresses or precinct numbers or some part of the required information.

4. Two hundred seventy-one signatures on sheets entitled "Registered Voters in Favor of Veterans' Honorarium" not attached to a full and correct copy of the title and text of Initiative Measure No. 54.

5. Counting as genuine, signatures of persons giving as their places of residence locations outside the state of Montana.

The appellants also complain that the secretary of state counted forged signatures, illegible signatures, and signatures where the balance of the information required by section 37-103 was in different handwriting or typed in.

The latter defects could not be determined from the face of the petition. The secretary of state cannot determine whether a signature is forged or not. The same is true of the fifth objection above; there are registered voters in this state whose addresses are outside the state—for example, men in armed forces or in public service. The county clerk and recorder knows them and certifies their signatures and the secretary of state is bound thereby.

The statute, R. C. M. 1947, sec. 37-103, sets out the form of certification. The county clerk by this form certifies: "* * * I believe that the signatures of *(names of signers)* numbering *(number of genuine signatures)*, are genuine. As to the remainder of the signatures thereon, I believe that they are not genuine, for the reason that.......................; and I further certify that ..................... the following names (.....................) do not appear on the registration books and blanks in my office."

Strict compliance with this form would require the county clerk to copy the name of every signer of the petition in the body of the certificate. Many county clerks have adopted the practice of marking the genuine signatures with an identifying symbol and the names of signers that do not appear on the registration books with a different symbol. Then in certifying the petition to the secretary of state, instead of putting all the names of the signers in the body of the certificate, the certificate reads: "I certify that the signatures of [*number*] signers are genuine and are marked thus on the petition ....................., and I further certify that [*number*] signers marked thus in the petition ..................... do not appear on the registration books and blanks in my office."

Most of the petitions were so certified to the secretary of state and he counted the signatures certified in this manner as genuine. This is sufficient compliance with the statute.

The only purpose of listing the names is so that anyone wishing to challenge the sufficiency of the petition can identify the names of the registered voters whose signatures were accepted and certified by the county clerk and the names of those rejected. This can be done in the present petition by an examination of the identifying symbols.

The same is true of the insertion of identifying addresses or ■ precinct numbers. It is only necessary that the identity of the signer be sufficiently clear so that the county clerk can locate his registration for the purpose of certification. If the identifying information is supplied by someone else or written in by the person circulating the petition, it serves the same purpose as if the signer had himself written it. The essential item is that the petition be signed by a registered elector and the county clerk be enabled to identify the person signing as the same person whose name appears on his registration books.

As for the 271 signatures not attached to a full and correct ■ copy of the title and text of the measure, there is no allegation that the sheets on which the signatures appeared were not properly attached at the time they were signed. That is the crucial time. If they become detached in the office of the county clerk or the secretary of state, their validity is not impaired.

For the purpose of the cause at bar it is admitted that the secretary of state counted 149 signatures not certified in any manner. The Constitution requires that an initiative petition be signed by eight per cent of the legal voters of the state. The basis for determining the number of legal voters is the total number of votes cast for governor at the preceding general election. Art. V, sec. 1. That total was 222,964 in the November 1948 election. To meet the constitutional requirement the petition was required to have 17,833 legal signers. The petition as certified by the secretary of state had 17,901 signers. The appellants charge that the secretary of state counted 149 names not certified by the county clerks nor proved as provided by section 37-103 and therefore not entitled to be counted. If these names

had been deleted the petition would have had but 17,752 signers and would not have been entitled to certification by the secretary of state.

But whether the sheets of the petition were properly attached ▆ to a full and correct title and text of the measure, or whether 149 signatures were certified or not, becomes immaterial in this particular case where no challenge was made until after the election had been held. The statute requires that the petitions be filed four months before the general election and that the public be notified of the pending initiative by publication in the newspapers in every county. The reason for this is so that persons interested, or those who believe that they will be adversely affected by the passage of the measure, will have time to investigate the sufficiency of the petition and take appropriate action to enjoin the placing of the measure on the ballot if the petition is in fact insufficient. At the oral argument of this cause counsel for appellants stated that he had so investigated after the petition was filed and before the election but had done nothing about it.

The purpose of the constitutional requirement that "eight ▆▆ per cent. of the legal voters of the state shall be required to propose any measure by petition; provided, that two-fifths of the whole number of the counties of the state must each furnish as signers of said petition eight per cent. of the legal voters in such county", Const. Art. V, sec. 1, is that trivial matters shall not be presented. There must be sufficient interest so that a substantial number of people of the state desire the legislation proposed, and the public interest must not be a local one but must be such that the required number of voters in two-fifths of the counties desire such legislation. If the sponsors of an initiative measure are not able to secure sufficient signers on their petition, then the proposal is deemed of such slight public interest as not to warrant the expense of an election. But after the people have voted on the measure and a great majority of the voters throughout the state have expressed their approval, the courts presume that the public interest was

there and technical objections to the petition or its sufficiency are disregarded.

In Ford v. Mitchell, 103 Mont. 99, 61 Pac (2d) 815, and Sawyer Stores v. Mitchell, 103 Mont. 148, 62 Pac. (2d) 342, there were timely actions filed to enjoin the secretary of state from certifying the proposed initiative measures, because of an insufficient petition. This is the remedy available for any person opposed to the measure.

In Barkley v. Pool, 102 Neb. 799, 169 N. W. 730, 732, the sufficiency of a referendum petition was questioned. The court said the question must be raised in time for the appellate court to rule upon it prior to the election. The court said, "both the Constitution and the statute contemplate a speedy hearing, to the end that judgment may be had in time for the next ensuing election, and that the courts would be justified in refusing to entertain an action or defense because of laches on the part of either of the parties."

In Beene v. Hutto, 192 Ark. 848, 96 S. W. (2d) 485, 488, the Arkansas court declared: "* * * after a question is submitted to and voted upon by the people, the sufficiency of the petition is of no importance. It is not important because, whether sufficient or insufficient, if the measure is adopted by the people at the election, it becomes the law."

A recent case is Renck v. Superior Court of Maricopa County, 66 Ariz. 320, 187 Pac. (2d) 656, 659, in which the court affirmed a declaration in a previous Arizona case: " 'It has been frequently determined that if parties allow an election to proceed in violation of the law which prescribes the manner in which it shall be held, they may not, after the people have voted, then question the procedure.' " The reason for this is that such action on the part of the court would be an invasion and usurpation of the legislative functions and a violation of the constitutional separation of the powers of government.

We agree with a subsequent assertion of the Arizona court in Hernandez v. Frohmiller, 68 Ariz. 242, 204, Pac. (2d) 854, 865: "* * * after a statute has been passed by a vote of

the people and promulgated as the law, this court's sphere of inquiry is and should be whether the law itself in its final form is constitutional as to its provisions, and not whether there was a constitutional defect in the proceedings leading to its final passage. The act as initiated and proclaimed by the governor is the act that the court will examine in determining its constitutionality, and at this time, consonant with the rule herein announced, we refuse to give legal effect to the procedural defect. There was a time to raise procedural questions, but it was before the votes were cast and not after the law had been proclaimed to be the law of the state." Accord: Kerby v. Griffin, 48 Ariz. 434, 62 Pac. (2d) 1131, 1135, 1138; Mayer v. Adams, 182 Ga. 524, 186 S. E. 420, 424; Weisgerber v. Nez Perce County, 33 Idaho 670, 197 Pac. 562, 563; Knorr v. Beardsley, 240 Iowa 828, 38 N. W. (2d) 236; State ex rel. Thompson v. Winnett, 78 Neb. 379, 110 N. W. 1113, 1117, 10 L. R. A., N. S., 149; City of Albuquerque v. Water Supply Co., 24 N. M. 368, 174 Pac. 217, 221, 5 A. L. R. 519; State ex rel. McNeill v. Long, 178 Okl. 409, 63 Pac. (2d) 60, 62; Vickers v. Schultz, 195 Wash. 651, 81 Pac. (2d) 808, 810; Routt v. Barrett, 396 Ill. 322, 71 N. E. (2d) 660.

However, it is contended that even though alleged irregularities in the petition do not invalidate the measure, it is now a nullity because it was not submitted to the people in conformity with the requirements of Article IX, sec. 2, of the Montana Constitution, and R. C. M. 1947, secs. 23-303 and 37-107.

Section 2 of Article IX, Montana Constitution, reads: "If the question submitted concerns the creation of any levy, debt or liability the person, in addition to possessing the qualifications above mentioned, must also be a taxpayer whose name appears upon the last preceding completed assessment roll, in order to entitle him to vote upon such question."

Supplementing this provision of the Constitution is section 23-303, R. C. M. 1947: "Qualifications of electors at elections on incurring state indebtedness. At all elections at which the question submitted is the incurring of a state debt, the issuance

of bonds or debentures by the state, other than refunding bonds or debentures, or the levying of a state tax for any purpose, only registered electors residing within the state and who are taxpayers upon property therein and whose names appear upon the last completed assessment roll of some county of the state for state, county and school district taxes, shall be qualified to vote on such question.'' And section 37-107: ''Any measure proposed to be submitted to the people and which concerns the creation of any state levy, debt or liability, including the issuance of state bonds or debentures other than refunding bonds or debentures, shall be submitted to the eligible voters as defined by section 23-303 [R. C. M. 1947], upon a separate official ballot and no such measure shall be submitted on a general ballot.''

The appellants maintain that the measure creates a state debt, levy or liability and therefore should have been placed on a separate ballot (to be voted upon by taxpayers whose names appeared on the last completed assessment roll) instead of on the regular ballot (to be voted upon by the entire electorate). Therefore, they conclude, the election was a nullity.

The governor's proclamation that the question would be submitted to the ''qualified voters'' was issued July 22, 1950. On August 16, 1950, the secretary of state certified the general election ballot to the county clerks. As certified by the secretary of state Initiative Measure No. 54 was to be submitted on the general election ballot to be voted upon by all qualified electors. The time to object that this matter was being improperly submitted was before the election in order that the election officials could properly present the question on a separate ballot to the taxpayers, if that were necessary. By waiting until after the election was held and the measure approved by the people those opposing the measure waive their objections. In this respect the rule is the same as that applicable to irregularities in the petition cited supra. The laches of the appellants in failing to make a timely attack on the preliminary

proceedings prevents them from raising such questions after the vote of the people and the promulgation of the Act.

Furthermore it is the established rule that it must be shown that a different result would have been reached had the matter been submitted at the election to the taxpayers only. In Martin v. State Highway Commission, 107 Mont. 603, 615, 88 Pac. (2d) 41, 47 the identical question was raised. In that case the question was the validity of an initiative measure providing for a gallonage tax on gasoline and the issuance of highway debentures. There, as here, the contention was made that the Act was a nullity because it had not been submitted on a separate ballot to the taxpayers. This court held: "However, it was not shown here that a different result would have obtained at the polls had the question been submitted to the taxpayers only as the Constitution commands. Where, as here, the contention arises after the election and not before, and where no showing is made that the measure would have been defeated had it been submitted to taxpayers only, the fact that some were permitted to vote who were not qualified will not defeat the measure. As above pointed out, the measure carried by nearly four to one. We fail to see how plaintiff, or anyone else, could at this time show that if the measure had been submitted to taxpayers only it would have been defeated. In other words, it is virtually impossible to make this objection effective after such a decisive election. Under the circumstances the Act will not fail on this account."

This has long been the rule in this jurisdiction. "[A]fter an election has been held, a party will not be permitted to challenge it unless he can show that a different result would have been reached but for the conditions of which he complains." Potter v. Furnish, 46 Mont. 391, 394, 128 Pac. 542, 543. "[T]he election should be held valid unless it appears that a sufficient number of legal voters to have changed the result were prevented from casting their ballots." Reid v. Lincoln County, 46 Mont. 31, 59, 125 Pac. 429, 438. "[I]t is well settled that where a statute has been approved by voters, election infor-

malities not shown to have affected the result will not be considered." Pioneer Motors, Inc., v. State Highway Commission, 118 Mont. 333, 341, 165 Pac. (2d) 796, 800; State ex rel. Hay v. Alderson, 49 Mont. 387, 418, 142 Pac. 210, Ann. Cas. 1916B, 39; Shekelton v. Toole County, 97 Mont. 213, 219, 33 Pac. (2d) 531; Dubie v. Batani, 97 Mont. 468, 37 Pac. (2d) 662; 29 C. J. S., Elections, sec. 214, p. 308.

Where the vote carried by a substantial margin of approximately three to two it cannot be said that a different result would have been reached had the question been submitted to the restricted class of taxpayers.

A good deal of the argument of both counsel was devoted to a discussion as to whether this was a measure that created a "state debt, levy or liability" and should be voted upon as provided by Article IX, sec. 2, Montana Constitution, R. C. M. 1947, secs. 23-303 and 37-104, or whether because the Act provided that the indebtedness incurred would not be a general obligation of the state and the excise tax imposed fell upon taxpayers and non-taxpayers alike it should be voted upon by all the voters upon the general ballot. That question is not properly before us at this late date after the election. It cannot be raised by the appellants at this time and therefore we express no opinion on that subject. Nor may any inferences be drawn from the absence of such a ruling.

There is no validity in any of the objections raised in appellants' first cause of action. Some may have had merit had they been properly raised in a timely action prior to the election but where as in the case at bar the election has been held the will of the people there expressed by their vote should not be defeated. State ex rel. Kehoe v. Stromme, 49 Mont. 25, 139 Pac. 1002; State ex rel. Hay v. Alderson, 49 Mont. 387, 142 Pac. 210; Shekelton v. Toole County, 97 Mont. 213, 33 Pac. (2d) 531.

The second cause of action raises various constitutional questions which relate to the power of the people or the legislature to enact such a measure under any conditions.

The first contention is that this is a special law for assessment and collection of taxes and therefore arbitrary because cigarettes only are taxed. This contention is wholly without merit. The practice of levying an excise tax upon tobacco is so well established that it is no longer open to question. Among the cases sustaining such excise tax against the argument here advanced are: Mississippi State Tax Commission v. Flora Drug Co., 167 Miss. 1, 148 So. 373; Havens v. Attorney General, 91 N. H. 115, 14 A. (2d) 636; Head v. Cigarette Sales Co., 188 Ga. 452, 4 S. E. (2d) 203; Vending Machine Co. v. Oklahoma Tax Commission, 183 Okl. 427, 82 Pac. (2d) 1069; Ploch v. City of St. Louis, 345 Mo. 1069, 138 S. W. (2d) 1020; Ex parte Kimberlin, 126 Tex. 60, 86 S. W. (2d) 717.

The validity of an Act almost identical to the Act at bar was sustained recently under the Washington Constitution against an attack like the one here advanced. Gruen v. State Tax Commission, 35 Wash. (2d) 1, 211 Pac. (2d) 651. Thirty-nine of the 48 states now constitutionally levy taxes upon cigarettes as did the state of Montana by R. C. M. 1947, sec. 84-5606, prior to the passage of Initiative Measure No. 54.

It is contended that Initiative Measure No. 54 is an illegal and unconstitutional delegation of power to members of the board of examiners. This contention is based upon the proposition that the board of examiners is empowered to fix the terms of the bonds to be issued and the dates of maturity. In other words, to fix the time limit for the payment of the debt created by the Act, and therefore it is contended that this vests in the board of examiners legislative power in violation of Article IV of the Montana Constitution. The basis of this contention is the provision of Article XIII, sec. 2, of the Montana Constitution which requires that a law authorizing the debt shall "provide for the levy of a tax sufficient to pay the interest on, and extinguish the principal of such debt within the time limited by such law for the payment thereof".

In the instant case standards have been established. The law plainly and specifically defines the persons entitled to

receive the honorarium and the conditions under which they are entitled to its benefits. When the applications for the honorarium are filed, and when the cut-off date arrives, it can be plainly determined by a mere mathematical calculation how much money is necessary to pay the honorarium demands of the veterans. There was no way to know how much would be brought in each year by the cigarette tax. However, the tax is certain and it is irrevocably set aside for the payment of a sum that can be made certain. It can be used for no other purpose than to pay the honorarium and the interest on the bonds so long as any bonds are outstanding. The fact that the standards set up in the statute to guide the administrative agency are broad and general does not affect the validity of a statute. Thompson v. Tobacco Root Co-Op State Grazing District, 121 Mont. 445, 193 Pac. (2d) 811. Had the Act set a time limit for the payment of the debt, there would have been an objection that a decrease in the return might not be sufficient to pay the bonds within the time limit. The amount needed to pay the honorarium and the income to be received from the cigarette tax are both unknown. In such a situation the matter was properly left to the determination of the board of examiners under the guidance of the general provisions of the Act.

In previous cases involving the levying of excise taxes on gasoline in order to support Montana's highway program, delegation of ministerial power to an administrative body has been sustained. For instance, power to determine the amount of debentures sold, power to determine the time when the debentures should be sold, and the option to call the debentures prior to maturity were all sustained in Pioneer Motors v. State Highway Commission, 118 Mont. 333, 165 Pac. (2d) 796; Martin v. State Highway Commission, 107 Mont. 603, 88 Pac. (2d) 41; and Thomas v. State Board of Examiners, 122 Mont. 564, 207 Pac. (2d) 553.

If an administrative board can determine the time in which the bonds of a fixed duration can be sold, the converse is true and the administrative board can sell the bonds at the

effective date of the Act and determine the date at which they shall be called. In any event the appellants have misread the provisions of section 2 of Article XIII. The Constitution of the state of Montana does not require that the legislature set a time limit on a debt; it merely requires that irrevocable and irrepealable law be passed providing for the levy of a tax sufficient to pay the interest on, and extinguish' the principal of the debt within, the time limited by law. Where, as here, there is no specific time limited by law and the law is expressly made irrepealable until the debt and the interest thereon has been extinguished, the constitutional mandate has been met.

It is further contended that section 2 of Article XIII has ▇▇▇ been violated in that the tax levied by Initiative Measure No. 54 is not sufficient to pay the interest on the bonds and extinguish the principal. We have already seen that there' is no time limit in the initiative measure for the payment of the bonds. The resolution of the board of examiners is to issue bonds in the amount of $13,550,000 in serial bonds, maturing in each year from 1952 to 1971, and $8,450,000 in term bonds, maturing on February 1, 1981. Past experience with the collection of the cigarette tax in the state of Montana indicates that the revenue obtained from the tax will be ample to pay interest and extinguish the indebtedness on the bonds in the period set by the board of examiners. This objection has been discussed in previous decisions of this court, the latest of which was Thomas v. Board of Examiners, 122 Mont. 564, 207 Pac. (2d) 553. We there held this to be a matter purely within the discretion of the legislature, and unless there is a positive, affirmative showing that the levy is inadequate this court will not interfere with the legislative functions. As a practical matter, experience with a cigarette tax has shown that in all probability the return will be more than adequate and many of the bonds will be retired prior to their maturity.

A further constitutional objection is that the Act appropriates ▇▇▇ money in contravention of Article V, sec. 1, Montana Constitution. There is no question as to the allocation of the

436

revenue from the tax to pay the interest and repay the bonds issued. Nor is there any question about the cost of processing and paying the claims of those entitled to the honorarium. This all comes out of the special fund created. It has been uniformly held that the constitutional prohibition against the appropriation of money by initiative is directed solely at appropriations from the general fund. State ex rel. Bonner v. Dixon, 59 Mont. 58, 195 Pac. 841; State ex rel. Boorman v. State Bd. of Land Comm'rs, 109 Mont. 127, 94 Pac. (2d) 201; Martin v. State Highway Commission, 107 Mont. 603, 88 Pac. (2d) 41; Pioneer Motors, Inc., v. State Highway Commission, 118 Mont. 333, 165 Pac. (2d) 796; State ex rel. Haynes v. District Court, 106 Mont. 470, 78 Pac. (2d) 937; and other cases therein cited. For a discussion of like cases from other jurisdictions see 146 A. L. R., pp. 284, 299.

The Act at bar however provides that the collection of the additional two cent tax shall be made by the state board of equalization in the same manner as the tax provided by R. C. M. 1947, sec. 84-5606. The cost of collection of a four cent tax is no greater than a two cent tax; there is no increased cost of stamps, no increase of personnel in the staff assigned to the collection of this tax, and the same application forms, receipts, etc., are used. Therefore, since no additional administrative cost is involved, the theory that there is an appropriation from the general fund is untenable.

The principal constitutional objection arises as a result of the case of State ex rel. Mills v. Dixon, 66 Mont. 76, 213 Pac. 227, which held that a bonus act passed in 1922 for the benefit of the veterans of the first world war was unconstitutional. The case ruled that payments to veterans were not for a public purpose, and constituted the lending of the credit of the state for donations or gratuities to individuals.

The proposition that a public purpose is served by legislation on behalf of veterans is now so thoroughly established that there can be no further debate. In Willett v. State Board of Examiners, 112 Mont. 317, 115 Pac. (2d) 287, 289, this court said:

"What is a public purpose is a question primarily for legislative determination, with which we will not interfere unless there has been a clear abuse of power." The legislature has enacted legislation for burial of ex-service men at public expense, for veterans' preference in public employment, for establishment and maintenance of a veterans' welfare commission, for the Montana soldiers' home, for re-employment and job security upon the veterans' return from service, for an educational fund for veterans of World War II, for free tuition for veterans of World War II at the state university, for tax exemption of veterans' club houses and exemption of veterans' organizations from the liquor license quota system and there may be others. Some of these Acts have been challenged and sustained. For example, State ex rel. Casteel v. State Board of Examiners, 56 Mont. 621, 190 Pac. 1117, sustained the constitutionality of the Veterans' Welfare Act as for a public purpose. State ex rel. Campbell v. Stewart, 54 Mont. 504, 171 Pac. 755, Ann. Cas. 1918D, 1101, sustained the War Defense Act of World War I. Cases in accord from other jurisdictions are collected in annotations in 147 A. L. R. 1432; 140 A. L. R. 1525; 15 A. L. R. 1359; 13 A. L. R. 587; and 7 A. L. R. 1644. Some representative decisions discussing this question are: Veterans' Welfare Board v. Jordan, 189 Cal. 124, 208 Pac. 284, 22 A. L. R. 1515; Lyman v. Adorno, 133 Conn. 511, 52 A. (2d) 702; Hagler v. Small, 307 Ill. 460; 138 N. E. 849; State ex rel. Griffith v. Davis, 113 Kan. 4, 213 Pac. 171; Opinion of Justices, 211 Mass. 608, 98 N. E. 338; Gustafson v. Rhinow, 144 Minn. 415, 175 N. W. 903; Fahey v. Hackmann, 291 Mo. 351, 237 S. W. 752; Bauernfeind v. Nestos, 48 N. D. 1218, 189 N. W. 506; Hinton v. Lacy, 193 N. C. 496, 137 S. E. 669; Mackey v. Reeves, 44 S. D. 153, 182 N. W. 700; Gruen v. State Tax Commission, 35 Wash. (2d) 1, 211 Pac. (2d) 651; State ex rel. Atwood v. Johnson, 170 Wis. 218, 175 N. W. 589, 7 A. L. R. 1617.

The second thesis of State ex rel. Mills v. Dixon, 66 Mont. 76, 213 Pac. 227, that at most the state of Montana owed but a moral obligation to its veterans and that a moral obligation

was not sufficient to support an appropriation of public money has been overruled in the later case of Mills v. Stewart, 76 Mont. 429, 247 Pac. 332, 47 A. L. R. 424. The question there was the validity of an appropriation to reimburse a student at Montana state university for damages incurred as a result of a fall in the residence hall. This court pointed out that since a state cannot be sued without its consent there was no legally enforce-' able obligation. But it was an obligation that in equity and justice should be recognized and was therefore valid. This is the overwhelming weight of authority. See the annotation in 172 A. L. R. 1407.

There is no higher obligation owed by the state than to its citizens who leave their homes to defend it. No amount of reimbursement can compensate the men and women who sacrificed their lives to save their state and nation. But in partially compensating the living for their sacrifice the state is carrying out the most solemn obligation of equity and honor.

That part of State ex rel. Mills v. Dixon, 66 Mont. 76, 213 Pac. 227, in conflict with the views herein expressed is expressly overruled.

There is no merit in any of the appellants' objections. Initiative Measure No. 54 was presented to the people without objection, approved by a substantial majority and proclaimed a law of this state. It is a valid measure calculated to partially compensate Montana veterans of World War II for sacrifice in the struggle to preserve peace and democracy for the people of our state and nation.

The judgment is affirmed.

MR. JUSTICE BOTTOMLY concurs.

MR. CHIEF JUSTICE ADAIR (specially concurring).

Initiative Measure No. 54 appearing in the Session Laws of 1951 at page 781 was submitted to the voters of this state at the general election held November 7, 1950. Prior to the holding of such election no protests or objections were made to the measure

or to the manner or form in which it was being submitted but after its passage, two separate suits were commenced in the district court of Lewis and Clark county questioning the validity of the measure. A couple of months after the election was held the Wilford case, bearing district court No. 22542, was commenced and about a month later the instant Graham and Mark case, bearing district court No. 22583, was instituted. District Judge A. J. Horsky presided in the Wilford case and District Judge John B. McClernan presided in the Graham and Mark case, the latter having been called to preside because of the disqualification of the judges of both departments of the trial court. A judgment of dismissal was entered in each suit the effect whereof was to disallow all the objections raised against the measure and to sustain its validity. Thereafter an appeal was taken to this court from each judgment so entered.

To either affirm or reverse these judgments requires the rejection and overruling of certain decisions long since pronounced by this court, hence the appeals present serious problems of far-reaching import and effect.

At the outset attention was directed to this court's decision in State ex rel. Mills v. Dixon, No. 5260, 66 Mont. 76, 213 Pac. 227, commonly referred to as the "Bonus Case" decided in 1923 by a unanimous court, wherein Referendum Measure No. 25, found in Chapter 162 of the Laws of 1921 was declared invalid as providing for a donation or a gift and as such contrary to the provisions of section 1 of Article XIII of the Montana Constitution. Since then various other decisions have been pronounced by this court which fail to either distinguish or follow the Mills case, supra, and with which decision they appear to be in hopeless conflict. A careful consideration of such subsequent decisions has caused the five justices who heard and who are now called upon to determine the present appeals to conclude that the provisions of the Constitution relied upon in the Mills case do not prohibit the state of Montana from granting an honorarium to its service men and women and all the justices are in complete accord in disapproving and over-

ruling the holdings and expressions to the contrary which appear in this court's opinion in State ex rel. Mills v. Dixon, No. 5260, 66 Mont. 76, 213 Pac. 227.

In the organic law of this state the people have reserved unto themselves the power to initiate measures in the manner and subject to the restrictions and limitations therein provided. In the exercise of the power so reserved the measure in question was initiated. However the record shows that various provisions of the law were neither observed nor complied with in the submission of Initiative Measure No. 54 and the court is called upon to determine how such omissions and failures may affect the validity of the measure when no complaint was made prior to the holding of the election.

There appears to be two lines of decisions in this state on the point in issue.

Certain decisions follow the case of Potter v. Furnish, 46 Mont. 391, 394, 128 Pac. 542, 543, decided in 1912, wherein this court speaking through Mr. Justice Holloway, with Mr. Chief Justice Brantly and Mr. Justice Smith concurring, said "it is a rule of well-nigh uniform recognition that, after an election has been held, a party will not be permitted to challenge it unless he can show that a different result would have been reached but for the conditions of which he complains." The Potter case, supra, has been cited with approval on this point in numerous decisions of this court. See State ex rel. Hay v. Alderson, 49 Mont. 387, 142 Pac. 210, Ann. Cas. 1916B, 39; State ex rel. Patterson v. Lentz, 50 Mont. 322, 345, 146 Pac. 932; State ex rel. Lockwood v. Tyler, 64 Mont. 124, 139, 208 Pac. 1081; Holt v. Custer County, 75 Mont. 328, 330, 243 Pac. 811; In re Bank's Estate, 80 Mont. 159, 168, 260 Pac. 128; Tipton v. Mitchell, 97 Mont. 420, 430, 35 Pac. (2d) 110, and Martin v. State Highway Commission, 107 Mont. 603, 614, 88 Pac. (2d) 41, 47.

On the other hand in Weber v. City of Helena, 89 Mont. 109, 297 Pac. 455, decided in 1931, a city bond election was declared illegal even though the challenge was not made until after the

election had been held and in Herrin v. Erickson, 90 Mont. 259, 275, 2 Pac. (2d) 296, 303, also decided in the same year (1931) the court said "it is the duty of the court to apply the constitutional restrictions which the people have placed upon themselves, irrespective of the expediency or desirability of upholding any legislative enactment."

Notwithstanding its holding in the Weber case, supra, in the more recent case of Martin v. State Highway Commission, supra, decided in 1939, this court quoted and applied the rule of the earlier Potter case, supra, but listed the Weber case, supra, among the authorities relied upon to sustain its holding.

Here relators would have us overrule the Martin case which would mean the disapproving also of the Potter case and those decisions above listed which have since followed and applied the rule of such early case. While we are not in accord with the decision in the Martin case it would seem, that under the doctrine of *stare decisis,* such decision here governs. Counsel for relators admitted on oral argument that long prior to the election relators were fully aware of the defects, failures and omissions of which they here complain yet they withheld their protests and objections until after the election was had so that at this late date neither their complaint nor their objections were timely nor are they now of any avail. Under such facts and circumstances relators' protests were silenced by the election and the initiative measure so voted upon and passed must be held to be valid. On these grounds I concur in affirming the judgment.

MR. JUSTICE FREEBOURN:

I concur in the foregoing opinion.

In passing I leave a thought, neither legal nor profound, just a homespun sort of pun.

Is it not strange that the change—from tissue and weed to smoke and ash—can bring so much happiness to so many from naught but cigarette smokers' cash?

May all our veterans profit from the same source!

442

THE HONORABLE C. B. ELWELL, district judge sitting in place of Mr. Justice Angstman, disqualified:

I dissent in this case because, while I am in accord with the decision on one major issue and several minor issues, I am in disagreement on what I consider vital issues in this case.

I am in thorough accord with the decision on the major issue as to whether or not the state of Montana, under its Constitution, can grant servicemen an honorarium. I think that they have properly overruled the case of State ex rel. Mills v. Dixon, 66 Mont. 76, 213 Pac. 227. I believe that the United States cannot be at war and the state of Montana not be involved. I believe that when a citizen of Montana volunteers or is inducted into the United States Army he still retains his identity as a citizen of Montana. I believe there is at least a moral obligation to him on the part of the state of Montana, and that this moral obligation is sufficient to sustain the law now under question. No one has ever questioned the right of the state and its counties to provide burial benefits for veterans, even to those who did not live in Montana at the time of their service. If this honorarium is a pure gift without any obligation, then the burial benefit is a pure gift. I would much prefer to do something for the service personnel before death than after death. My conclusion is the thing sought to be accomplished by this Act is not unconstitutional provided it is accomplished in a legal way.

On several legal questions, which I consider minor I am in accord with the majority opinion, particularly those which have to do with the technical requirements of the law. I do not think it is fatal that the exact requirements as to certification of the initiative petitions have not been followed. If the secretary of state can ascertain therefrom what names have been certified, and what names not certified, it is sufficient. I do not think it is fatal that some have not given their full address or in fact any address when signing the petitions, particularly at this stage of the game. If the information given is sufficient to enable the county clerk and recorder to certify them, that is enough. I do not think that the fact that certain signers have

given post office addresses outside the state is of any moment, as we have many qualified voters who could easily have out-of-state addresses by reason of military service, civil service, or attendance at various schools. I also agree that the secretary of state could not be expected to detect forged signatures on the original petitions. On all these things I am in thorough agreement.

On the question of whether this law contains an appropriation in contravention of the constitutional prohibition against the inclusion of appropriations in initiative measures, it has been repeatedly held by the supreme court of this state that this applies only to appropriations from the general fund. I am not in thorough agreement with all that has been said now or before on this question. It has been upheld so many times in connection with highway and school bond issues that I can see no point in saying anything further other than to state I can see no reason to apply one ruling to highways and schools and a different ruling in this case. The same is true of the contention that a tax on cigarettes is illegal in its present form. The same kind of tax has repeatedly been held legal on gasoline for highway purposes, and I can see no difference. If one is legal the other is legal.

However, there are questions raised in connection with the calling of the election, and the conduct of the election, which I consider vital.

It is alleged and admitted by the demurrer that the secretary of state counted 149 names not certified by anyone, and that if the 149 signatures had not been counted there would not have been sufficient signatures to entitle the secretary of state to certify the matter for submission to the voters. It is further alleged that certain of the petitions did not carry a correct copy of the title and text of the law as required, and that if such petitions had not been counted, not only would there have been insufficient signatures, but the required number of counties would not have been represented on the petitions. The majority seem to indulge the presumption that they were at one time

attached and became detached somewhere along the line. I cannot bring myself to the point of indulging this either as a presumption or supposition. If it is true it is a matter of defense which is not before us. In connection with the 149 names to which no certificate was attached they do not indulge in such a presumption, namely that the certificate must have become detached. They state in effect that if the 149 names were not certified and if without them there were not sufficient signatures then the secretary of state would not have been entitled to issue his certificate.

The majority condones this action on the ground that it is too late to raise the question after the election. It must be conceded that the supreme court has so held several times previously. There may be some logic to this in some cases on the ground that after the secretary of state issued his certificate there was sufficient time to raise this question before the election was held. I will concede that as to technical objections this is good law. But as to objections which go to the very foundation for the calling of the election, no such concession should be made. I do not base my decision on this point in the final analysis, but I am loath to shift upon the shoulders of every elector in Montana the burden of following all these legal processes to check and see that our elected and appointed officials obey the laws and particularly the Constitution of the state of Montana. I have no desire to say that a law is clearly unconstitutional before it is voted upon and becomes a contsitutional law after it has been voted on. I fear that this is equivalent to saying that anything is constitutional if you can get away with it.

The final and most damaging claim is that this measure was submitted to the entire voting list and not, as the law and Constitution provides, to the registered voters who were taxpayers on the last assessment rolls, and further that it was not submitted upon a separate ballot, and that the failure to do so was willful on the part of our elected officials. I will deal with the main point that it was not submitted to the proper list of

voters, which means that many were permitted to vote who were not entitled to vote.

The majority has failed to consider the matter of its submission to the entire electorate, although this is a very vital point, and the court held in Martin v. State Highway Commission, 107 Mont. 603, 88 Pac. (2d) 41, in the case of a gasoline tax that it should not be submitted to the entire voting list. I can see no difference and would hold that it should have been submitted to the limited electorate as provided by the Constitution. Many other questions of much less importance have been discussed at length.

But once more we are confronted by the argument that it is all over, that we did it, and even if we did it in an unconstitutional and illegal way, the objectors are too late, and they can do nothing about it. It must be admitted that the case of Martin v. State Highway Commission, supra, does in effect say so. The reasoning is not sound. In the first place we are not confronted with the argument that the objectors had four months in which to discover this perversion of the law by their elected officials. We have only to consider the average voter. He is entitled to believe that the elected officials of the state will do their duty and that elections will be conducted in the manner directed by law. The overwhelming majority of them do not know until they enter the voting booth whether a bill of this kind will be or should be submitted to the entire voting list or to a list of voters having the qualifications prescribed by law. If he cannot thereafter question the election, we as a court are placing upon him the onerous task of watching his elected officials every minute to see that they do their duty at the risk of losing his constitutional rights.

Now, as to this so-called saving clause in the decision of Martin v. State Highway Commission, supra, giving the taxpayer the right to question the election after it has taken place, provided he can show that a different result would have been reached had the law been followed. It is a hollow and meaningless phrase. It means that the objector will have to check the

voting lists in all the counties and all the precincts in Montana, no small job. They will have to be checked, not as of today, but with relation to the time of this election. He will then have to check the assessment rolls of each county, not as of now, but once more go back to the time of the election. Then he will have to check the voting list of each precinct in the state to see how many ballots were handed out for voting, to whom given, and whether each voter obtaining a ballot was legally entitled to vote at this election on this measure. Then he must determine how many voted on this measure and how many failed to vote on this measure. If a percentage of the ballots were not voted as to this measure, then by some feat of magic, he must determine how many of those who failed to vote on this measure were qualified voters and how many were unqualified voters. This he must do in a state where the ballot is presumed to be secret. Then he must seek out those unqualified voters who actually used their ballots on this particular measure, and ascertain *if he can* how many voted for and how many against this particular measure, all the time bearing in mind that upon him is cast the burden of proof by this so-called rule, and that he must be prepared to shoulder the expense and spend the time to get all this proof in shape to present to the court. By the time he can accomplish this he and all his friends will be broke, exhausted, discouraged or dead, and the odds are all against his winning. This so-called exception or saving clause is meaningless.

It would be better logic and law to say that in all this confusion caused by the failure of the officials to observe a plain constitutional provision, and not just some technical procedural provision, there must come a time when a *prima facie* case has been made out, and any existing legal burden of proof shifted to those defending the legality of their actions. The showing of the violation of a basic and essential provision of the Constitution should establish a *prima facie* case for the plaintiff, and the burden should then be upon the defendant to show that the same result would have obtained if the Constitution had been followed.

It could be stated more simply by saying that we do have a Constitution, and we do have laws, and that it is time that the courts and lawyers devoted a little more attention to following the Constitution and the laws, and considerable less time to finding ways of circumventing them.

Having examined some of the cases cited in support of this theory that the objector must show that a different result would have been reached had the law been followed, it appears that in the beginning it was applied to more or less technical objections, and no doubt some of the writers of such decisions would be astounded to find it now applied to matters which involve plain basic constitutional provisions. In support of this burden placed on the objector is quoted 29 C. J. S., Elections, sec. 214, p. 308. The opposite could also be supported by quoting from the same paragraph at page 309, as follows: ''An election will be vitiated by irregularities which are so numerous that they must be attributed to fraud rather than honest mistake; and although no actual fraud is apparent yet an election will be invalidated where the whole conduct of the election officers shows such gross negligence and disregard of their official duties as to leave the judicial mind in doubt as to how the election resulted, or would have resulted but for such widespread irregularities''. The same paragraph states in effect that where there has been an almost total disregard of the election law, or where the disregard of the law has been so fundamental that it is impossible to distinguish what votes are lawful and what are unlawful, the election would be vitiated.

With a consciousness that there are rules for constitutional interpretation, it must be remembered that the first rule is that where a law is plain and unambiguous, and the same is true of a constitutional provision, there is nothing to interpret, and the law as it is written should be followed. We have been too prone to raise doubts which have no real basis, just for the sake of arguing and construing, where there is nothing to argue about or to construe. We have been too prone to make exceptions to meet what we personally may consider the exi-

448

gencies or needs of the present, and to make small breaches in the Constitution which tend to grow into large holes and which must ultimately break down our constitutional form of government, or at least leave our Constitution in such shape that it is past all recognition. The bench and the bar have often and loudly lamented the encroachment of one branch of the government upon another branch, while at the same time encroaching on the legislative branch and the Constitution, by amending the laws and the Constitution itself by judicial interpretation, a power which was never granted or intended to be granted to the judiciary.

I must dissent and would reverse the decision of the lower court and remand this case for further proceedings in conformity with this decision.