ANNE C. BROWN, Individually and as Administratrix of the Estate of ROBERT L. BROWN, Deceased, Appellant, v. M. E. MORRIS, Director of Revenue, State of Missouri, and ALBERT S. ARENSON, Collector of Revenue, Division of Collection, Department of Revenue, State of Missouri, Respondents, No. 45349—290 S. W. (2d) 160.

Court en Banc, May 14, 1956.

*Robert L. Brown* and *John B. Sharpe* for appellant.

*John M. Dalton,* Attorney General, and *Robert R. Welborn,* Assistant Attorney General, for respondents.

[162] STORCKMAN, J.—This declaratory· judgment action attacks the constitutionality of the Missouri cigarette tax law which was approved by the voters at an election held on October 4, 1955, pursuant to a referendum ordered by the general assembly. The act imposes a tax for public school purposes at the rate of one mill per cigarette upon the sale of cigarettes in the State of Missouri. Chapter 149, RSMo 1949, V.A.M.S. The plaintiffs appealed from an adverse judgment.

The plaintiffs, a husband and wife co-partnership, were engaged in the selling of cigarettes at wholesale and retail in the City of St. Louis. The plaintiff Robert L. Brown died after the appeal was taken and his right of action has been revived, so that Anne C. Brown individually and as administratrix of the estate of Robert L. Brown, deceased, is now the appellant. The defendants, being the director of

revenue and the collector of revenue, respectively, were sued in their capacities as state officers and are the respondents on this appeal.

The relief requested in plaintiff's amended petition is that the cigarette tax law be declared unconstitutional, void and of no effect on the ground that the legislative bill was not signed by the speaker of the house of representatives in accordance with the provisions of § 30 of Art. III of the 1945 Constitution[1] and on the further ground that the original legislative bill "became lost" and an authenticated and certified copy of the bill in lieu of the original was passed by the general assembly. The appellant states the question involved on appeal is "whether or not the signing of a legislative bill by the presiding officers of each of the houses of the general assembly is mandatory before the bill shall become a law."

[163] The cigarette tax law had its genesis in Senate Bill No. 351 which was introduced in the senate of the 68th Missouri General Assembly on April 5, 1955. One section of the bill provided for its submission to the qualified voters of the state for their approval or disapproval at a special referendum election ordered to be held on October 4, 1955. The bill was read for the third time and passed by the senate on May 9, 1955. The bill was then transmitted to the house of representatives where the events occurred that give rise to this litigation. .

There was a House Committee on Taxation and Revenue, the function of which was "to consider and report on all bills pertaining to the administration of taxation and revenue laws." However, Senate Bill No. 351, after being read twice, was referred by the speaker of the house to the House Committee on Governmental Organization and Related Matters. The purpose of this committee, as shown by the rules of the house, was to "consider and report upon all matters relating to the reorganization, consolidation and abolition of boards, bureaus, commissions and all other offices and departments of state, county and township governments; public buildings of the state including the Division of Public Buildings and the capitol grounds; and state libraries and the legislative library."

The speaker delivered possession of the original bill to the committee chairman, Joseph Tanner, representative of the second district of Jackson County. Mr. Tanner testified that he left Jefferson City on the evening of May 11, after receiving the bill, and that he did not

---

[1]All constitutional references will be to the 1945 Constitution of Missouri unless otherwise noted. The entire text of Section 30 is: "No bill shall become a law until it is signed by the presiding officer of each house in open session, who first shall suspend all other business, declare that the bill shall now be read and that if no objection be made he will sign the same. If in either house any member shall object in writing to the signing of a bill, the objection shall be noted in the journal and annexed to the bill to be considered by the governor in connection therewith. When a bill has been signed, the secretary, or the chief clerk, of the house in which the bill originated shall present the bill in person to the governor on the same day on which it was signed and enter the fact upon the journal."

return until the morning of May 30, which was the day before the general assembly was required to adjourn by virtue of constitutional provision. The chairman had set hearings on the bill for May 24 and May 30, but no committee hearings were held and there was no committee action.

On May 18 the house of representatives by a vote of 79 to 33 relieved the committee of further consideration of Senate Bill No. 351 and placed it at the top of the house calendar entitled "Senate Bills for Third Reading." The original of the bill could not be found and an authenticated copy was used in its stead. On May 19 Senate Bill No. 351, as amended, was read for the third time and passed. The house journal shows "The speaker declared the bill passed."

On May 24 the bill was returned to the senate with a request for concurrence in House Amendment No. 1. After once refusing to do so, the senate concurred on May 31, the last day of the session. The Senate Committee on Bills Truly Agreed To and Finally Passed thereafter reported that the bill had been duly enrolled and correctly printed. The bill was signed by the president of the senate and transmitted to the house.

The speaker of the house refused to affix his name in the blank provided for such purpose on the enrolled copy of the bill, but did attach to said bill a statement which he signed, "Roy Hamlin, Speaker of the House," reading as follows:

"I have returned the attached purported Senate Bill No. 351 unsigned for the reason that Senate Bill No. 351 as passed by the Senate and sent to the House has not been read in the House on three successive days as required by Section 21, Article III of the Constitution. Same was read the second time, assigned to the Committee on Governmental Organization and Related Matters and said bill is still in the possession of the Chairman of said Committee, and has not at any time been passed by the House of Representatives as required by the above section of the constitution."

The original enrolled bill and the original perfected copy of Senate Bill No. 351 were delivered to the office of the secretary of state. The attorney general furnished the secretary of state with a ballot title which he certified to the county clerks and the election commissioners. Publication of the notice of the special election which included a complete copy of the bill was made in 212 newspapers in the state. Proof of such [164] publication was received by the secretary of state and introduced in evidence.

At the referendum election held on October 4, 1955, 230,851 votes were cast in favor of the measure and 95,717 were cast against it. This result was certified by the secretary of state to the governor and on October 26, 1955, the governor issued his proclamation declaring the measure approved upon the referendum.

No legal action was taken prior to the election, but this action for a declaratory judgment was filed on October 8, 1955.

The speaker of the house and the committee chairman both testified at the trial of this case. The speaker testified that he did not see the bill from the time he delivered it to Chairman Tanner on May 11 until the morning of June 1, which was the day after the legislature adjourned. In the meantime he had talked on the telephone with Chairman Tanner who was in the State of Kansas and had been told that the original bill was in the chairman's possession in Jefferson City. However, a search of the chairman's office failed to reveal the bill.

Chairman Tanner testified that when he left Jefferson City on May 11 he locked the original bill in a filing cabinet; that he received inquiries as to the whereabouts of the bill when he was in the State of Kansas, and that he returned to Jefferson City on May 30 but that he did not remove the bill from his office until June 1 when he delivered it to the chief clerk's office.

The committee chairman and the speaker of the house were doubtless under the misapprehension that no action could be taken on the pending bill because of the failure of the committee to hold its hearings and to report on the bill. Sec. 27, Art. IV of the 1875 Constitution did provide that "no bill shall be considered for final passage unless the same has been reported on by a committee." However, this provision has been eliminated entirely and § 22 of Art. III now provides that "one-third of the elected members of the respective houses shall have power to relieve a committee of further consideration of a bill and place it on the calendar for consideration." By this authority the house relieved the committee but the chairman and the house speaker evidently continued under the misguided notion that the house could not proceed without the original bill. This means of blocking legislation, commonly known as "sitting on the bill," is the very practice these constitutional changes were designed to prevent. In the face of the chairman's perverseness in retaining the original bill, the house was justified in proceeding with an authenticated copy. No question was raised as to its correctness.

It is generally recognized that the purpose of requiring legislative enactments to be signed by the presiding officers is to provide a "mode of authentication" evidencing the fact that a particular bill has been passed in due form by the legislative body involved. Field v. Clark, 143 U.S. 649, 671, 12 S.Ct. 495, 36 L. Ed. 294. The appellant does not deny that the bill in question *passed* both houses of the general assembly, but only contends that the speaker of the house did not sign the bill and that signing by him was a mandatory prerequisite of the bill's validity.

As a general rule, after a legislative measure has been passed by the general assembly, approved by the voters on referendum and proclaimed by the governor to be in full force and effect as a law of the State of Missouri, the courts will not hold such act invalid because of procedural errors or defects occurring during the course of its

adoption. Moore v. Brown, 350 Mo. 256, 165 S.W.2d 657, 663; State v. Burns, 351 Mo. 163, 172 S.W.2d 259, 265; § § 31, 52(b), Art. III, 1945 Constitution of Missouri. In the Moore case, the secretary of state was enjoined from printing a proposed constitutional amendment on the ballot because the proposed amendment contained more than one article. The court held the defect complained of was one of procedure which could not be attacked after approval of the measure referred, stating, 165 S.W.2d l.c. 663: **[165]** ''We therefore hold said requirements of Secs. 12287 and 12289 are not substantive, and that an amendment cannot be held void after adoption because such requirements were disregarded.'' State v. Burns, a prosecution for signing a spurious name to an initiative petition, approved the holding in the Moore case, and further stated, 172 S.W.2d l.c. 265: ''* * * if the petition were not challenged on that ground and were submitted to vote and adopted, the amendment would be valid (as regards that point) notwithstanding the legal insufficiency of the petition.''

Cases from other states so holding are: Hernandez v. Frohmiller, 68 Ariz. 242, 204 P. 2d 854, wherein the court held that the civil service act was not unconstitutional because the secretary of state, in certifying the same to the board of supervisors, abbreviated the title, stating, 204 P. 2d l.c. 865: ''We do not condone but rather condemn the failure of the secretary of state to follow strictly the constitutionally prescribed procedure herein; but after a statute has been passed by a vote of the people and promulgated as the law, this court's sphere of inquiry is and should be whether the law itself in its final form is constitutional as to its provisions, and not whether there was a constitutional defect in the proceedings leading to its final passage. * * * There was a time to raise procedural questions, but it was before the votes were cast and not after the law had been proclaimed to be the law of the state.'' State ex rel. Graham v. Board of Examiners, 125 Mont. 419, 239 P. 2d 283, being an action attacking a measure submitted and adopted at an initiative election on the ground that the petitions were insufficient in form and lacked sufficient signatures. The court held that these procedural questions could not be raised after the election approving the measure, stating, 239 P. 2d l.c. 289: ''But after the people have voted on the measure and a great majority of the voters throughout the state have expressed their approval, the courts presume that the public interest was there and technical objections to the petition or its sufficiency are disregarded.'' The opinion in this case collects and discusses a number of other similar decisions.

Our next inquiry, then, is to determine whether signing of bills by the presiding officer, as provided in § 30, is a substantive and mandatory part of legislative proceedings, as contended by the appellant, or whether the lack of such authentication is directory only and

954

a procedural defect that is cured by approval of the act on referendum.

The language of § 30, standing alone, gives plausibility to appellant's argument. She also cites the cases of State ex rel. Attorney General v. Mead, 71 Mo. 266, and State ex rel. Schmoll v. Drabelle, 261 Mo. 515, 170 S. W. 465, in support of her contention. The Mead case dealt with § 37 of Art. IV of the Constitution of 1875 and purported to hold that the requirement that "No bill shall become a law until the same shall have been signed" by the presiding officers of the two houses was mandatory and that the other provisions of the section were directory only. The Drabelle case repeated and approved what was said in the Mead case. However, neither of these cases involved a situation in which the presiding officer of either of the houses of the Missouri General Assembly had failed to sign a bill and therefore what they said on that precise question is dictum.

Appellant also cites cases from other states and the annotation in 95 A.L.R. 278 on the effect of the failure of officers of the legislature to sign bills as required by constitutional provision. Extended discussion of these cited cases is unnecessary, however, because of material changes made by the 1945 Constitution in the legislative article. Old § 38, Art. IV, provided that "When the bill has been signed [by the presiding officers], as provided for in the preceding section" it shall be presented to the governor and if approved by him it "shall become a law." The revised section, now § 31, Art. III, provides: "All bills and joint resolutions *passed by both houses*" shall be presented to the governor and when approved by him "shall become a law." (Emphasis ours.) It will be noted that the [166] language "passed by both houses" has been substituted for "when the bill has been signed" as a prerequisite for presentation of the bill to the governor for his consideration. For convenient reference the old and new sections are set out below.[2]

Thus it affirmatively appears from § 31 of Art. III of the present constitution that passage of a bill by the general assembly plus its approval by the governor produces a validly enacted law. The con-

---

[2]Const. 1875, § 38, Art. IV: "When the bill has been signed, as provided for in the preceding section, it shall be the duty of the Secretary of the Senate, if the bill originated in the Senate, and of the Chief Clerk of the House of Representatives, if the bill originated in the House, to present the same in person, on the same day on which it was signed as aforesaid, to the Governor, and enter the fact upon the journal. Every bill presented to the Governor, and returned within ten days to the House in which the same originated, with the approval of the Governor, shall become a law unless it be in violation of some provision of this Constitution."

Const. 1945, § 31, Art. III: "All bills and joint resolutions passed by both houses shall be presented to and considered by the governor, and within fifteen days after presentation he shall return them to the house of their origin endorsed with his approval or accompanied by his objections. If the bill be approved by the governor it shall become a law. When the general assembly adjourns, or recesses for a period of thirty days or more, the governor may return within forty-five days any bill or resolution to the office of the secretary of state with his approval or reasons for disapproval."

stitution, Art. III, expressly provides substitutes for the governor's approval, such as passage by the general assembly over the governor's veto, § 32, failure of the governor to return a bill presented to him, § 33, or approval by the people on referendum, § 52(b), and still the measure will "become a law." However, the constitution provides no alternative for passage by the general assembly. What constitutes final passage of a bill is defined by § 27 as follows: "* * *, nor shall a bill be finally passed, unless a vote by yeas and nays be taken and a majority of the members elected to each house be recorded as voting favorably." It will be noticed that this definition of passage does not include signing by the presiding officers.

We should undertake to harmonize and give effect to all constitutional provisions, but in doing so we cannot read into § 31 the requirement of § 30 that the bill be signed by the presiding officer because in so doing *we would be restoring to the section a provision which was specifically eliminated when the new constitution was adopted.* The change is substantial and significant and the new language must be given its plain, ordinary and usual sense unless the context suggests otherwise. State ex rel. Kansas City v. Orear, 277 Mo. 303, 210 S.W. 392, 394 [2].

Furthermore, such interpretation would tend to restrict the legislative power and would impose a greater limitation upon the legislative department than § 31 provides. A constitutional provision limiting or restricting legislative power is strictly construed so as to favor the power of the legislature and not to extend the limitation beyond its terms. State ex rel. Hussmann Refrig. & Supply Co. v. City of St. Louis, 319 Mo. 497, 5 S.W.2d 1080; State ex rel. United Rys. Co. of St. Louis v. Public Service Commission of Mo., 270 Mo. 429, 192 S.W. 958; State v. Wilson, 265 Mo. 1, 175 S.W. 603. The rule that the express mention of one thing implies the exclusion of another would also weigh against the inclusion of the additional restriction since, where special powers are expressly conferred or special methods are expressly prescribed for the exercise of power, other powers and procedures are excluded. Kroger Grocery & Baking Co. v. City of St. Louis, 341 Mo. 62, 73, 106 S.W. 2d 435, 439 [7].

Section 31 clearly provides that constitutional requirements for action by the legislative body have been met when a bill has "passed both houses" of the general assembly. The bill is then ready for consideration by the executive or the voters [167] on referendum. Section 31 is a complete formula and its provision that a bill shall become a law when its terms are satisfied is positive and mandatory. If § 30 is construed to mean that signing by the presiding officer is also mandatory and the sine qua non of a valid bill, then a conflict with § 31 would exist.

Rules of construction which are helpful in this regard are found in the case of Kane v. Kansas City F. S. & M. Ry. Co., 112 Mo. 34, 39,

20 S.W. 532, 533, wherein it is stated: "It is a recognized rule of rational interpretation of laws that, where two interfere in their application to particular facts, we should follow that which is recommended by the most beneficial reasons. * * * It is proper to inquire into the consequences of any proposed interpretation of a law in determining what was the probable intention in its enactment. * * * That the letter of a statute must occasionally be cut down to conform to its evident spirit and intent is a maxim of interpretation which is not new in Missouri." These holdings of the Kane case have been approved in these more recent cases, among others: Bragg City Special Road Dist. v. Johnson, 323 Mo. 990, 20 S.W.2d 22, 25; City of St. Louis v. Christian Bros. College, 257 Mo. 541, 165 S.W. 1057, 1059; McGill v. City of St. Joseph, 225 Mo.App. 1033, 38 S.W.2d 725, 727; St. Louis County v. Marvin Planing Mill Co., 228 Mo.App. 1048, 58 S.W.2d 769, 770. Constitutional provisions are subject to the same rules of construction as statutes except that consideration should be given to the broader purposes and scope of constitutional provisions. State on inf. of Dalton v. Dearing, 364 Mo. 475, 263 S.W.2d 381, 386 [3].

We must also keep in mind that where a statute is attacked as unconstitutional it will be sustained if there is any reasonable theory upon which it may be upheld and it will not be held unconstitutional unless it clearly and undoubtedly contravenes some constitutional provision. State on inf. of Dalton v. Metropolitan St. Louis Sewer Dist., 365 Mo. 1, 275 S. W. 2d 225, 234 [23]; Hickey v. Board of Education of City of St. Louis, 363 Mo. 1039, 256 S.W.2d 775, 778 [11].

Due regard for a coordinate branch of the government would likewise require that any doubt as to the power of the legislature be resolved in favor of the general assembly and against nullifying or restricting its power of operation. Bohrer v. Toberman, 360 Mo. 244, 227 S.W.2d 719, 723-24 [6, 7].

If the failure of the speaker of the house to sign invalidates this otherwise duly enacted law, then such presiding officer would be more powerful than the governor whose right of veto does not extend to measures referred to the people. Sec. 52(b), Art. III. The general assembly may pass a bill over the governor's veto, but, if the appellant's contention is correct, the particular house would be helpless if its own presiding officer by failing to sign in effect vetoed a bill finally passed.

Section 31 makes it clear that the indispensable step is final passage and it follows that if a bill, otherwise duly enacted as a law, is not attested by the presiding officer, other proof that it has "passed both houses" will satisfy the constitutional requirement. Sutherland Statutory Construction, 3rd Ed., Vol. I, p. 221, § 1304, advances this reasoning as to the function and necessity of the signature of the pre-

siding officer: "In sum the signature of the presiding officer is only a certificate to the governor that the bill has passed the requisite number of readings and has been adopted by a constitutional majority of the house over which he presides. If this information is available to the governor and to the courts by journals which are recognized admissible in evidence, the procedural protections set by the constitution have been complied with, and the bill should be enforceable as a properly enacted statute."

In Missouri, legislative journals are not only admissible in evidence but the courts may judicially notice the history of legislation as reflected by the record [168] thereof in the legislative journals. State ex rel. Karbe v. Bader, 336 Mo. 259, 78 S.W.2d 835. It is quite apparent that neither the governor nor the courts are dependent upon the certificate of the presiding officer. They may determine from the legislative journals whether a bill has "passed both houses." Thus we can notice that Senate Bill No. 351 was read for the third time and passed in the house of representatives on May 19, 1955, by a vote of 80 ayes to 12 noes, and that such vote was the requisite constitutional majority for final passage. State ex rel. McCaffery v. Mason, 155 Mo 486, 55 S.W. 636, 641; § 27, Art. III, 1945 Const. of Mo.

We hold that the provisions of § 30 that no bill shall become a law until it is signed by the presiding officers of both houses, under the facts of this case, is directory only and the failure of the speaker of the house to sign Senate Bill No. 351 is a procedural defect or error which has been cured by the approval of the voters on referendum. This is "the evident spirit and intent" of the pertinent constitutional provisions. The holding conforms to the rules of law and standard of construction noted. 82 C.J.S. 253, § 148, states the general rule as follows: "After an initiative measure has been passed by a vote of the people and promulgated as a law, alleged constitutional defects in the proceedings leading to its final passage will not be considered. Also statutory provisions governing initiative and referendum procedure may be considered mandatory when attacked before an election, but after an election it has been held that they will be considered directory only."

Appellant further contends that the trial court "should have declared that the measure was not enacted as other bills are enacted and thus there was a failure to comply with the Constitution and the people voted upon invalid bill." Special reference is made to § 52(a) of Art. III which provides that a referendum may be ordered by petitions "or by the General Assembly, as other bills are enacted." It is contended that the bill was defective in that it was not signed by the speaker of the house of representatives and also by the governor. This is a slightly different approach to the same question we have decided. The order by the general assembly for the referendum was a part of Senate Bill No. 351 and what we have said with

958

reference to the bill likewise applies with respect to the provision for the referendum and the special election.

The respondents also urge that the signature of the speaker of the house upon his written objections attached to the bill should be construed as a signing by him within the meaning of § 30 for all purposes. However, since we have held that the signature of the presiding officer is not required in the present circumstances, a decision of this contention is unnecessary.

■ The fact that the bill was not signed by the governor and, in fact, was not presented to him for signature, was not pleaded or presented to the trial court for its decision. It cannot be presented here for the first time unless it can be said to be such a constitutional question as necessarily inheres in the cause. Thompson v. St. Louis-San Francisco R. Co., 334 Mo. 958, 69 S.W.2d 936, 942 [5]. Assuming without deciding that it is such a question, it clearly appears that the governor's signature was not necessary to constitute the bill a valid enactment since the measure was referred by the general assembly and was approved by the people on referendum.

Sec. 52(b) of Art. III provides that "The veto power of the governor shall not extend to measures referred to the people." By § 49, Art. III, the people "reserve power to approve or reject by referendum any act of the general assembly" with exceptions not here important. The veto power of the executive should not be construed to restrict the power of the general assembly or the people unless such intent clearly appears. Its nature and function is thus stated in 82 C.J.S. 85 § 52: "The authority of an executive to set aside an enactment of the legislative department is not an inherent power, and can be exercised only when sanctioned by a constitutional provision, and only in the manner and [169] mode prescribed. The executive's veto power is a power conditionally to prevent legislation, but is not the power to enact new laws or to recall or modify old laws. The veto power is in derogation of the general plan of the state government, and provisions authorizing it must be strictly construed, so as to limit its exercise to the powers expressly enumerated or necessarily implied."

We construe the limitation on the governor's veto power as set out in § 52(b) to be applicable before a referendum measure is submitted to the people as well as after the act has been approved by the voters.

We rule against appellant's contentions and find the act is not unconstitutional. The judgment should be affirmed and it is so ordered. All concur.