STATE OF MISSOURI on the Information of JOHN M. DALTON, Attorney General, Relator, v. WILL B. DEARING, AGATHA BECKER, ROBERT B. BROOKS, RICHMOND C. COBURN, DONALD GUNN, MARY HALL, JOHN I. ROLLINGS, ALFRED SCHINDLER, CHESTER STOVALL, CHARLES M. WARNER, JOHN J. COLE, HOWARD ELLIOTT, S. JOSEPH FLORI, JOHN W. GIESECKE, FRED H. GRAF, LEO J. HAYES, MARTIN J. JAEGER, KURT A. SCHRADER and WILLIAM WYNN, Respondents, No. 43830—263 S. W. (2d) 381.

Court en Banc, January 11, 1954.

*John M. Dalton*, Attorney-General, and *Fred L. Howard*, Assistant-Attorney, for relator.

476

*Roberts P. Elam* for respondent.

478

ELLISON, J.—This is an amended Information in the nature of quo warranto brought by the Attorney General directly in this court and submitted on briefs. We have jurisdiction because it is an original remedial writ. Art. V, Sec. 4, Const. Mo. 1945. It involves a construction of Art. VI, Sec's 30(a) and 30(b), Const. 1945.

Sec. 30(a) authorizes the people of the city and county of St. Louis to consolidate their respective territories and governments [382] into one political subdivision under the municipal government of the city, and, among other things (4) to establish a metropolitan district or districts for the functional administration of services common to the area included therein. In this case it is proposed to establish a metropolitan mass transportation district.

The power so given must be exercised by vote of the people of the city *and* county upon a plan prepared by a board of freeholders consisting of nineteen members, nine of whom shall be electors of the city and nine from the county, along with one from some other county.

Upon the filing with the officials in general charge of elections in the *city* of a petition proposing the exercise of the powers granted by said constitutional provisions, signed by registered voters of the city in a number equaling 3% of the total vote cast in the city at the last general election for governor, and the certification thereof by the election officials to the mayor and governor, the following takes place.

Upon call of the mayor within *ten* days after the certification, the mayor and the judges of the circuit court of the city shall assemble in joint session at the city hall and proceed to appoint the *city's* nine members of the board of freeholders, not more than five of whom shall be members of or affiliated with the same political party. Each member so appointed shall be given a certificate certifying his appointment signed by the mayor and attested by the seal of the city.

Upon the filing with the officials in general charge of elections in the county of a similar petition signed by registered voters of the county, in such number as shall equal 3% of the total vote cast in the county at the last general election for governor, and the certification thereof by the *county election officials* to the *presiding judge of the circuit court* of the county and to the governor, the judges of the circuit court, probate court and county court, or other governing body, of the county within ten days after said certification.

And upon the call of the presiding judge (they) shall assemble in joint session at the court house of the county, and appoint the *county's* nine members of the board of freeholders, not more than five of whom shall be members of or affiliated with the same political party. Each member so appointed shall be given a certificate of his appointment signed by said presiding judge and attested by the seal of said circuit court.

Sec. 30(b) provides that upon certification of the filing of such similar petitions by the officials in general charge of elections of the city and county, the governor shall appoint one (the nineteenth) member of the board of freeholders, who shall be a resident of the state, but not of either the city or county. He shall be given a certificate of his appointment signed by the governor and attested by the state seal. * * The appointment of the board of freeholders shall be completed within *30* days after the certification of the filing of the petition, and at 10 o'clock on the second Monday after their appointment the members of the board shall assume the discharge of their duties, and meet from time to time.

It is their duty to prepare and sign a duplicate plan for the proposed district improvements and return it to the officials having general charge of city and county elections within one year after the appointment of the board of freeholders. The election officials shall submit the plan to the voters of the city and county in separate elections to be held within 90 days after the filing of the plan and not on or within 70 days of any state or county primary or general election in the city or county.

If a majority of the qualified electors of the city and county voting on the plan in their separate elections shall vote therefor, then at such time as shall be prescribed therein the same shall become the organic law of the territory therein defined, and shall supersede all laws, charter provisions and ordinances inconsistent therewith relating to said territory.

Prior to November 1, 1952, petitions were duly filed pursuant to the foregoing constitutional provisions of Art. VI, Sec's 30 (a) and (b) for the establishment of a "metropolitan district for the functional administration of *sewer services* common to the city of St. Louis and the county of St. Louis." The appointment and organization of a board of freeholders pursuant thereto was duly completed by January 12, 1953, and said board of freeholders has been since its appointment, and still is, acting and functioning as such.

Likewise prior to November 1, 1952, similar petitions conforming to the requirements of said Sec. 30(a) as to the number of signing registered voters, were duly filed with the election officials of the city and county, for the appointment of a board of freeholders for the establishment of a "metropolitan district for the functional administration of *mass transportation* services common to the city of St. Louis and the county of St. Louis."

As will be seen, the foregoing procedure contemplated the establishment of *two* boards of freeholders, one for the functional administration of *sewer services* and the other for the functional administration of *mass transportation services*. The appointment and organization of the first board of freeholders [for sewer services] was completed by January 12, 1953, and it has been functioning ever since.

On December 11, 1952, the officials in general charge of elections in the city of St. Louis, that is to say the Board of Election Commissioners, duly made certification of the petition in the second suit governing mass transportation. On December 13, 1952, the mayor of the city of St. Louis issued a call for a joint meeting of the mayor and circuit judges of the city to be held at the City Hall on December 18, 1952, to act upon said petitions for mass transportation services. Being unable to complete their work they adjourned or recessed until December 23, 1952, when they found the required percentage of registered voters had signed, and appointed as the city's nine members of the board of freeholders, the following: Agatha Becker, Robert B. Brooks, Richmond C. Coburn, Donald Gunn, Mary Hall, John I. Rollings, Albert Schindler, Chester Stovall and Charles M. Warner. All of these were duly given their respective certificates of appointment.

Also on December 11, 1952, supra, when the freeholders' petitions for mass transportation services were filed, certification thereof was made to the Governor [then Hon. Forrest Smith]. And it appears without question that these certifications were received at the office

of Governor Smith on December 12, 1952. But for some reason they were not called to his attention, or to the attention of Governor Donnelly, his successor in office, until more than 30 days after January 23, 1953. Upon receipt and verification of that information Governor Donnelly appointed the ninetcenth member of the Board of Freeholders, respondent Will B. Dearing of Jefferson County, on April 1, 1953.

In the meantime *on* January 23, 1953, the officials in general charge of elections in the *county* of St. Louis duly made certification of the foregoing freeholders' petition for functional administration of mass transportation services, and on January 31, 1953, upon call of the presiding judge of the circuit court of St. Louis County, the judges of the circuit and probate courts of the county and the members of the County Council [the governing body of the county] assembled in joint session and appointed the respondents John J. Cole, Howard Elliott, S. Joseph Flori, John W. Giesecke, Fred H. Graf, Leo J. Hayes, Martin J. Jaeger, Kurt A. Schrader and William Wynn, as the county's nine members of a board of freeholders.

Each was duly given a certificate of his appointment. But not until more than 30 days after January 23, 1953, did the incoming Governor Phil M. Donnelly become informally, and for the first time, apprised of the aforesaid certification by the Board of Election Commissioners of the City of St. Louis of the filing of the last mentioned freeholders' petition for the functional administration of mass transportation services. And he did not make the appointment ▮▮▮ of the nineteenth member of the Board of Freeholders, Will B. Dearing, until April 1, 1953, after verifying the foregoing information.

The Attorney General, relator, assigns three reasons why the proceedings in this case *fail* to show the board of freeholders was legally appointed, and on the contrary establish that it was not. The first reason is that Dearing, the last member of the board, was not appointed by the Governor until April 1, 1953, whereas the last certification of the filing of the petition for mass transportation services was made by the election officials of St. Louis County on January 23, 1953, *two months and seven days* (67 days) earlier, whereas Art. VI, Sec.30(b) of the Constitution provides the appointment of the board of freeholders "shall be completed within *30* days after the certification of the filing of the petition."

The second reason assigned in relator's brief is that constitutional provisions are mandatory, and that directions given therein respecting the time or modes of procedure for the exercise of a power create a presumption that the power should be exercised only in that time and manner, citing 11 Am. Jur., pp. 686-688, §§ 69, 70; 1 Cooley's Constitutional Limitations (8 ed.) pp. 159-160, 164; Harfst v. Hoegen, 349 Mo. 808, 814(1), 815(2), 816(3), 163 SW. (2d) 609, 612 (3-7);

State ex inf. Mcⁱ ₁ttrick v. Wymore, 343 Mo. 98, 108, 118, 119 SW. (2d) 941, 944, ₁d a number of other decisions.

It is said iⱦ 11 Am.Jur., p. 686, §69, supra, that: ''The courts usually hesitʹ e to declare thatʹa constitutional provision is directory merely in ⱦ ⱦw of the tendency of the legislature to disregard provisions wⱦ ⱦh are not said to be mandatory. Accordingly, it is the general ⱦ ₁le to regard constitutional provisions as mandatory, and not to ⱦ ₁ve any discretion to the will of a legislature to obey or to disregaⱦ d them. This presumption as to mandatory quality is usually followⱦ ⱦ unless it is unmistakably manifest that the provisions are intend ⱦ to be merely directory. The analogous rules distinguishing mandⱦ ⱦry and directory statutes are of little value in this connection and aⱦ rarely applied in passing upon the provisions of a constitution.

''So strong is the inclination in favor of giving obligatory force to the terms of the organic law that it has been said that neither by the courts nor by any other department of the government may any provision of the Constitution be regarded as merely directory, but that each and every one of its provisions should be treated as imperative and mandatory, without reference to the rules distinguishing between directory and mandatory statutes.''

Likewise, 1 Cooley on Constitutional Limitations (8 ed.) Vol. 1, pp. 159-160, supra, states: ''But the courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of a constitution. Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules are looked upon as essential to the thing to be done; and they must then be regarded in the light of limitations upon the power to be exercised.

''It is the province of an instrument of this solemn and permanent character to establish those fundamental maxims, and fix those unvarying rules by which all departments of the government must at all times shape their conduct; and if it descends to prescribing mere rules of order in unessential matters, it is lowering the proper dignity of such an instrument, and usurping the proper province of ordinary legislation. We are not therefore to expect to find in a constitution provisions which the people, in adopting it, have not regarded as of high importance, and worthy to be embraced in an instrument which, for a time at least, is to control alike the government and the governed, and to form a standard by which is to be measured the power which can be exercised as well by the delegate as by the sovereign people themselves. If directions are given respecting the time or modes of proceeding [385] in which a power should be exercised, there is at least a strong presumption that the people designed it should be exercised in that mode only; * * * .''

The sections involved in this case were adopted in our last Constitution, of 1945. They were taken from the Constitutional Amendment of November 4, 1924, Laws Mo. 1925, p. 414. There have been many changes in the present new constitutional provisions, a large part of which are shown in black type. They are organic and in our opinion were not intended to be open to alteration by statute or construction of the courts. In other words, what they say is fundamental and not open to change, except insofar as interpretation is necessary to arrive at the meaning of the fundamental act itself. When that meaning has been ascertained it cannot be changed even by statute.

It is said in 16 C.J.S., p. 49, § 14: "A constitution should be construed with reference to, and in the light of, well-recognized and fundamental principles lying back of all constitutions. It is to be regarded as fundamental law to which all other laws must yield, and should be interpreted in such a manner as to carry out the broad general principles of government stated therein. Although the meaning or principles of a constitution remained fixed and unchanged from the time of its adoption, a constitution must be construed as if intended to stand for a great length of time."

Further, 16 C.J.S., p. 101, § 49, states: "It is a settled rule of constitutional construction that prohibitive and restrictive provisions are self-executing and may be enforced by the courts independently of any legislative action, unless the context and history of the legislation shows the contrary." And it is also said, 16 C.J.S., p. 120, § 61; "It is an established general rule that constitutional provisions are to be construed as mandatory unless, by express provision or by necessary implication, a different intention is manifest. Usually, therefore, constitutional provisions are mandatory rather than directory, and there are expressions to the effect that all constitutional provisions are mandatory."

The brief for the respondent members of the Board of Freeholders first asserts generally that the constitutional provisions here involved are to be construed neither strictly nor liberally, but are to be subjected to a fair interpretation with a view to ascertaining and giving effect to the intent of its framers and the people who adopted it. It is asserted the principles governing the construction of statutes are applicable to construction of constitutional provisions. On that point five decisions are cited.[1] These cases hold that at least a part of the provisions of our constitution are merely directory or legislative in character.

The Riesterer case quotes 1 Story, Constitution, § 451, which says:

[1]Riesterer v. Horton Land & Lbr. Co., 160 Mo. 141, 151, 61 SW. 238, 240; State ex rel. Lashly v. Becker, 290 Mo. 560, 579, 235 SW. 1017, 1020(3); State ex rel. Harry L. Hussmann Refrg. & Supply Co. v. City of St. Louis et al., 319 Mo. 497, 507, 5 SW. (2d) 1080, 1084(4); Graves v. Purcell, 337 Mo. 574, 592(2), 85 SW. (2d) 543, 547(3); State ex rel. City of Carthage v. Hackmann, 287 Mo. 184, 190, 229 SW. 1078, 1080(3).

"It is a settled rule of construction that, 'every word employed in the Constitution is to be expounded in its plain, obvious, and common-sense meaning, unless the context furnishes some ground to control, qualify, or enlarge it. Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of life, adapted to common wants, designed for common use, and fitted for common understandings. * * *' "

Continuing, the Riesterer case says: "There is a great diversity of opinion as to whether any provision of a Constitution can be construed to be merely directory, and the rule obtains in some jurisdictions [386] that every provision of the Constitution is mandatory." But it goes on to say that in this state provisions of the Constitution have been held merely directory, such as the provision in Sec. 21, Art. III, Const. 1945 that "The style of laws of this state shall be: 'Be it enacted by the General Assembly of the State of Missouri, as follows' "; and also the provision that "all writs and process shall run * * * in the name of the 'State of Missouri' "; and likewise the formalities with which a bill must be signed in open session, under Art. III, Sec. 30, Const. 1945.

So, also, it is said "The *organic* law is subject to the same general rules of construction as other laws, *due regard being had* to the broader objects and scope of the former, as a *charter* of popular government." [Emphasis ours] State ex rel. Carthage v. Hackmann, 287 Mo. 184, 190, 229 SW. 1078, 1082(3); State ex rel. Hussmann Refrigerator & Supply Co. v. City of St. Louis et al., constituting Board of Public Service of City of St. Louis, 319 Mo. 497, 509, 5 SW. (2d) 1080, 1084(4).

Another general rule of importance in determining the true meaning and scope of constitutional or statutory provisions is the intent and purpose of the lawmakers. Graves v. Purcell, 337 Mo. 574, 582(2), 85 SW. (2d) 543, 547(3).

In the instant case the powers given the people of the city and county of St. Louis are immune from legislative interference. They were first conferred by constitutional amendment, Laws Mo. 1925, p. 414, and reconferred and broadened in 1945 by Laws Mo. 1945, pp. 44-6. There can be no question about the fact that these powers are vested in the city and county. The question here at issue involves the time limit.

Art. VI, Sec. 30(b) provides the appointment of the board of nineteen freeholders shall be completed within 30 days after the certification of the filing of the petitions for the improvement. The governor did not make the appointment of the nineteenth member of the board until April 1, 1953, which was 67 days too late under the time schedule fixed by Art. VI, Sec. 30(b) of the Constitution, that is to say 30 days

after the certification of the filing of the freeholders' petitions, which had been on January 23, 1953.

The latest decision in this state bearing on an analogous question, so far as we have found, is State ex rel. Rogersville Reorganized School District v. Holmes, State Auditor, 363 Mo. 760, 253 SW. (2d) 402. That case did not involve a violation of constitutional requirements, but only of statutory requirements affecting the validity of bonds issued by a reorganized school district, the validity of which depended on the validity of the district itself. The reorganization plan had been submitted at one school election and failed to carry. The statute, Sec. 165.693, R.S. 1949, provided in such event that any other plan should be submitted at a second election not sooner than one year nor later than two years after the disapproval of the first plan. The reorganization plan carried at the second election. But it was held five days too late—that is, it was five days later than the end of the two year period allowed for such elections. This court en banc held the election validated the school bonds.

In the instant case it is not contended that the 67 day delay in the Governor's naming of the nineteenth member of the Board of Freeholders for the administration of transportation services invalidated the plan therefor. But it will readily be seen that great inconvenience and delay would result if it involved the preparation of a new plan. And it can hardly be thought the original plan would be valid if it was prepared by only eighteen members, the appointment of the nineteenth member being void.

For these reasons the writ of quo warranto heretofore issued is quashed. All concur in result.