Yvonne M. KETCHAM, Robert L. Jackson, and Missourians for Responsible Government, Appellants,

v.

Roy D. BLUNT, Secretary of State, Respondent,

and

Missourians for Limited Terms, Intervenor–Respondent.

No. WD 46984.

Missouri Court of Appeals, Western District.

Dec. 15, 1992.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 22, 1992.

Application to Transfer Denied March 23, 1993.

Mark D. Mittleman and Robert A. Hutton, Jr., St. Louis, for appellants.

William L. Webster, Atty. Gen., Michael Boicourt and Simon B. Buckner, IV, Asst. Attys. Gen., Jefferson City, for respondent.

Gregory E. Upchurch, St. Louis, for intervenor-respondent.

Before SHANGLER, P.J., and TURNAGE and ULRICH, JJ.

SHANGLER, Presiding Judge.

The secretary of state certified that two initiative petitions to amend the Missouri Constitution by limiting the terms of the Missouri's state and federal legislators, respectively, had received sufficient signatures to qualify for the ballot. The plaintiffs Ketcham and Jackson, citizens of Missouri, and Missourians for Responsible Government, a campaign committee duly organized and existing for the purpose of opposing the initiatives to limit the terms of Missouri's legislators, brought a petition in the circuit court of Cole County under § 116.200, RSMo 1986, to reverse the certification of the initiative proposals by the secretary of state. The proponent of the initiative proposals, Missourians for Limited Terms, was granted intervention as a defendant.

The parties presented an extensive stipulation which is reflected in the findings of fact adopted by the circuit court. The dispute is not as to the facts, but as to the legal effect of the facts adduced at the trial. The circuit court rendered judgment that the state and federal term limits initiatives were legally sufficient and directed the secretary of state to certify them for the general election ballot on November 3, 1992. The plaintiffs Ketcham, Jackson and Missourians for Responsible Government appeal the judgment.

In July 1992, intervenor-defendant Missouri for Limited Terms filed with the defendant secretary of state two initiative petitions in the general form described in § 116.040, RSMo 1986. The petitions sought to amend the Missouri Constitution by limiting the terms of Missouri's state and federal legislators. For each of the proposals the secretary of state exercised his prerogative under § 116.130 to send the petition pages to the local election authorities to verify that each signature on the petitions was the signature of a registered voter within the relevant election district.

For each petition, the secretary of state instructed the local election authorities to mark the individual signatures according to 15 CSR § 30–15.020, which specifies that signatures of registered voters shall be marked with an "R", signatures for which there is no record shall be marked "NR", signatures for which the address listed on the petition is not the address at which the person was registered on the date the petition was signed shall be marked "WA", and signatures for which a signature does not match the signatures on file with the election authority shall be marked "WS". In addition, the secretary of state directed the local election authority to certify on a form provided the total number of signatures checked, verified and disqualified.

The local election authorities returned the petition pages to the secretary of state, who relying upon the number appearing on the certification page, totaled the number of verified signatures certified in each congressional district. The secretary of state compared the certifications presented to him with the number of signatures he calculated to be required. Based on the information certified to his office, he reported that each proposal had met the signature requirements in the first, second, fourth, seventh, eighth and ninth congressional districts. The secretary of state then issued a certificate of the kind contemplated by § 116.150 for the state and federal term limits petitions.

The secretary of state determined that an initiative required 16,190 valid signatures to qualify in the eighth congressional district. He reached this number by taking the number of votes cast for governor in the 1988 general election within the eighth congressional district, multiplying the total by .08 [eight percent], and rounding upward to the nearest whole signature. He reported that the election authorities in the eighth congressional district had verified 16,256 signatures for the state term limits petitions and 16,966 signatures for the federal term limits petitions.

The parties stipulate that after the commencement of the litigation in the circuit court the secretary of state counted the signatures marked "R" and the total number of signatures on the state term limits petition pages from the eighth congressional district. He arrived at a figure that differed from that certified by the local election authorities.[1] He counted 16,753 signatures rather than the 16,256 signatures reported by the local election authorities.[2] In the circuit court the plaintiffs Ketcham, Jackson and Missourians for Responsible Government objected to all evidence offered to show that the number of valid signatures on the state petitions was greater than that certified by the secretary of state under § 116.150. The circuit court found that the two initiative propositions qualified for the ballot and directed the secretary of state to certify the initiatives to the election authorities of the state.

The appeal presents questions of (1) how the secretary of state shall calculate the number of signatures required to be on an initiative petition for a constitutional amendment in order to qualify it for the ballot, (2) the actual verification and invalidation of signatures on the petitions, and (3) whether the effective date clause of the federal term limits initiative petition is constitutional.

It was the conclusion of law of the circuit court that the number of petition signa-

tures required to qualify a constitutional initiative in any particular congressional district was eight percent of the number of the persons in that district who voted for governor at the last general election. The plaintiffs impugn that conclusion as error. They argue that the number actually required by Article 3, § 50 of the Missouri Constitution was eight percent of the registered voters of six of the congressional districts, so that at least 26,000 signatures in the eighth congressional district were required[3], and not the 16,190 calculated by the secretary of state. They conclude that neither the state nor the federal petition attained that number, and so both failed to qualify for the ballot.

The plaintiffs appealed to this court on October 26, 1992, and on October 27, 1992, applied to the Supreme Court en banc for transfer before argument and opinion. The Supreme Court en banc denied transfer on October 28. On that same day this court expedited the briefs and heard oral arguments on November 2, 1992, the day before the general election. At the conclusion of arguments we rendered oral opinion in open court affirming the judgment of the circuit court. This formal opinion follows.

■ The appeal directly implicates two provisions of the Missouri Constitution.

Article 3, § 50 provides:

---

1. *See* Appendix A.

2. The principal difference was that the total certified from Crawford County listed 584 fewer registered signatures on the state petitions than did the count by the secretary of state. *See* Appendix A.

3. That figure is derived by this evolved argument:

The total number of votes cast for governor in the general election of 1988 was 2,085,917. The number of registered voters in Missouri in 1988 was 2,943,025, or about 327,000 per congressional district. [*See* Official Manual of the State of Missouri for 1989–1990, page 507] It is plaintiffs' "straightforward" reading of §§ 50 and 53 that the proponents of an initiative proposal must submit 2,085,917 signatures—the number of votes cast for governor. The signatures must be of registered voters. The plaintiffs explain that eight percent of 327,000 [the

average number of registered voters in a congressional district] in six of the nine congressional districts yields a figure of more than 156,000 signatures. Thus, plaintiffs read Article 3, § 50, to require somewhat more than 26,000 signatures of registered voters per congressional district in order to place a proposed constitutional amendment on the ballot.

It is the sense of their full reading of §§ 50 and 53 that the total number of signatures of *legal voters—i.e. registered voters*—necessary to qualify the initiative for the ballot is derived from the count of the total registered voters in the state, and not from the count of the registered voters in each congressional district, and certainly not from the count actual votes cast for governor in the district. The 2,085,917 count of signatures is gathered from across the state, but even that total suffices to place the initiative on the ballot only if each of six congressional districts [two-thirds of nine] has contributed signatures equal to eight percent of its registered voters.

Initiative petitions proposing amendments to the constitution shall be signed by eight percent of the legal voters in each of two-thirds of the congressional districts in the state ...

Article 3, § 53 provides:

The total vote for governor at the general election last preceding of any initiative or referendum petition shall be used to determine the number of legal voters necessary to sign the petition ...

The plaintiffs observe that although the two constitutional provisions "each appear to be absolute, and neither refers to the other," they are readily reconciled by their plain meaning. The plaintiffs resort to the maxim of constitutional construction that provisions that seem to be in conflict must be harmonized, and in that exercise the court "will give effect to express provisions in preference to implications." *See, e.g., In re Additional Magistrates for St. Louis County,* 580 S.W.2d 288, 299 (Mo. banc 1979). They conclude that the express provisions of each § 50 and § 53 are plain in meaning and easy to apply. They reason:

Section 53 establishes the *total* number of legal (i.e. registered) voters necessary to sign the petitions, while Section 50 pertains to the required geographical *distribution* of the signatures among the congressional districts of the state. Thus, a total of 2,085,917 [4] signatures is needed from across the entire state, but that total will suffice to put the measures on the ballot only if each of six congressional districts (two-thirds of the state's nine) has contributed signatures equal to eight percent of its registered voters.

This rationale reads *legal voters* in both § 50 and § 53 to mean *registered voters.* Thus, these constitutional provisions are read to require the proponents of an initiative to obtain signatures from a number of registered voters equal to the number cast in the governor's race at the last general election. That analysis derives its premise from the holding in *Scott v. Kirkpatrick,*

513 S.W.2d 442 (Mo. banc 1974), that "unless a person is registered he is not at any time legally entitled to vote." *Id.* at 444. The question before *Scott* was "who is a qualified voter legally entitled to vote" and so empowered to sign an initiative petition under the then governing statutes. *Id.* at 444. *Scott* responded that "a person must be legally entitled to vote on the measure proposed by the initiative petition on the day that [the person] signs it." *Yes to Stop Callaway County Comm. v. Kirkpatrick,* 685 S.W.2d 209, 211[3] (Mo.App. 1984). It is in that sense that *Scott* holds that "the signers of an initiative petition are required to be registered voters." *Id.* at 211. It is in that sense also that the term *legal voters* in § 50 means *registered voters.*

*Scott* decides only that under the statutes then supplementing referendum and initiative Article 3, only a person registered to vote may sign an initiative petition. *Scott* does not decide, as the plaintiffs postulate, that under § 50 the count of signatures to qualify the initiative for the ballot is in terms of registered voters. *Scott* makes emphatic, rather, that the provision by law for the registration of voters works no constitutional change. *Scott v. Kirkpatrick,* 513 S.W.2d at 444.

Moreover, however plausible the plain meaning the plaintiffs draw from §§ 50 and 53 as isolated readings, these provisions are not disparate, but *in pari materia* and must be read together. In general, the organic law is subject to the same rules of construction as other laws, except that due regard be given to the objects and scope of constitutional provisions as the charter of popular government. *State ex rel Upchurch v. Blunt,* 810 S.W.2d 515, 516[1–4] (Mo. banc 1991); *State ex rel. Dalton v. Dearing,* 364 Mo. 475, 263 S.W.2d 381, 386[3] (banc 1954). Provisions of the constitution that relate to the same subject matter are *in pari materia* and construction in such instances, as of statutes, proceeds on the premise that the pro-

**4.** The total vote cast for governor in 1988, according to the 1989–1990 Official Manual of the State of Missouri, page 510.

visions are intended to be read consistently and in harmony. *State ex rel. Rothermich v. Gallagher*, 816 S.W.2d 194, 200[11–13] (Mo. banc 1991).

The initiative and referendum were introduced to Missouri law in the 1908 amendment to the constitution of 1875 as Article 4, § 57. The amendment of 1908 was the basis for §§ 49, 50, 52(a), 52(b) and 53 of Article 3 of the Missouri Constitution of 1945. Historical Note, Mo.Const. art. 3, §§ 49, 50, 52(a), 52(b) & 53 (1945).

The portion of Article 4, § 57 of the 1908 amendment on which § 50 was based provided that:

> The first power reserved by the people is the initiative and not more than eight per cent of the legal voters in each of at least two-thirds of the congressional districts in the State shall be required to propose any measure by such petition ...

The portion of Article 4, § 57 of the 1908 amendment on which § 53 was based provided that:

> The whole number of votes cast for Justice of the Supreme Court at the regular election last preceding the filing of any petition for the initiative, or for the referendum, shall be the basis on which the number of legal voters necessary to sign such petition shall be counted ...

The requirements for gathering signatures under the procedures of predecessor § 57 and current §§ 50 and 53 are identical except for the percentages and the elective office for which the votes cast determine the number of signatures necessary to qualify the petitions for the ballot.[5] These

signature gathering components of predecessor § 57, albeit as they related to the referendum, were construed in *State ex rel. Kemper v. Carter*, 257 Mo. 52, 165 S.W. 773 (banc 1914). The court wrote:

> It will be seen that the sole question to be determined by our Secretary of State, before he files a verified referendum petition offered to him for filing, is to ascertain whether such petition has been signed by 5 per cent of the voters in each of two-thirds of the congressional districts of the state, as shown by the vote cast in the last preceding election for the office of judge of the Supreme Court. 257 Mo. 52, 165 S.W. at 780. (citation omitted.)

This construction of predecessor § 57 remains valid as an exposition of the method and logic of the signature gathering requirements of present §§ 50 and 53, which is their source, and with which they are *in pari materia*. See *Kemper v. Carter*, 257 Mo. 52, 165 S.W. at 780; 2B N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION, § 51.02 (5th ed 1992).[6] The history of these provisions does not tolerate the treatment of each, § 50 and § 53, as "absolute" and "isolated" from the other, as does the premise of plaintiffs' argument. Nor does it accommodate their theory that these sections require something other than did the secretary of state to qualify an initiative for the ballot: The signatures of registered voters in each of two-thirds of the congressional districts in the state, in a number equal to eight per cent of the persons who cast votes for Governor in each of such districts respec-

---

**5.** FILE NO. 4 IN THE 1943–1944 CONSTITUTIONAL CONVENTION OF MISSOURI, REPORT OF COMMITTEE ON INITIATIVE AND REFERENDUM REVISIONS AND AMENDMENTS—NO. 21, at 2 & 4 comments that what are now §§ 50 and 53 were the "[s]ame in substance as part[s] of Section 57, Article IV"—the original 1908 law.

**6.** The obvious difference between predecessor § 57 and present § 53 is that the basis for computation of signatures required for the filing of an initiative or referendum petition was changed from "the whole number of votes cast for Justice of the Supreme Court at the regular election last preceding the filing" to "[t]he total vote for governor at the general election last

preceding the filing ..." That is because the vote for Justice of the Supreme Court is now cast according to the plan for nonpartisan selection of judges adopted by constitutional amendment in 1940 as Article 5, §§ 29(a)–(g). See FILE NO. 4 IN THE 1943–44 CONSTITUTIONAL CONVENTION OF MISSOURI, REPORT OF COMMITTEE ON INITIATIVE AND REFERENDUM REVISIONS AND AMENDMENTS—NO. 21 at 7. The change in the basis for the computation of signatures required does not affect the logic of the position of either the secretary of state or of the plaintiffs. Nor does it diminish the precedential cogency of *State ex rel. Kemper v. Carter*, 257 Mo. 52, 165 S.W. 773 (banc 1914)

tively at the last preceding general election. A fair reading of §§ 50 and 53, *in pari materia,* and consonant with the exercise by the people of the reserved " 'power to propose and enact or reject laws and amendments to the Constitution,' " confirms that the decision of the supreme court en banc in *Kemper v. Carter* still governs as precedent. That is also the sense of our decision in *Payne v. Kirkpatrick,* 685 S.W.2d 891 (Mo.App.1984).

The thesis of the plaintiffs that the term *legal voters* as used in § 53 to compute the number of signatures necessary to sign a petition for the initiative means *registered voters,* moreover, becomes less plausible since registration did not become a legal qualification for voting until 1973. *See Scott v. Kirkpatrick,* 513 S.W.2d at 444. The insinuation into §§ 50 and 53 of the interpolation that the computation of the signatures required for the initiative is based upon the number of people who were registered, and so could have voted, rather than those who did vote, is sustained by neither the history and text of the provisions nor by precedent. *State ex rel. Kemper v. Carter,* 165 S.W. at 780. Nor is the formula for the distribution of the signatures among the congressional districts that the plaintiffs derive any more securely grounded. The point is overruled.

The second point on appeal asserts that the circuit court erred in concluding that each of the two initiative petitions attained 16,190 or more valid signatures in the eighth congressional district and so were eligible to be certified by the secretary of state for the ballot because the stipulation and the uncontested evidence established sufficient numbers of signatures which had to be invalidated so as to fall short of 16,190 on each petition.

The secretary of state certified the two ballot propositions under § 116.150. The certificate for each, the state term limitations petitions and the federal term limitations petitions, declared that the office of secretary of state had "conducted a verification of signatures contained on [the] initiative petition." Each certified further that signatures submitted for the eighth congressional district "were verified by a complete check of signatures as provided for in Section 116.130 RSMo and, based on information certified to this office" by the election authorities in the eighth congressional district, 16,256 signatures were verified for the state term limits petition and 16,966 for the federal term limits petition. The certification of the secretary of state concluded as to each, "[b]ased upon the results of the complete verification, the petition does contain a sufficient number of valid signatures" to comply with the constitution and statutes, and hence to qualify for the ballot.

It is the position of the plaintiffs that the secretary of state is bound by the count of signatures he reports on his certification document. That count was 16,256 on the state petitions in the eighth congressional district. The number of valid signatures in that district required to place the initiative on the ballot was 16,190. The margin of sufficiency on the state petitions in that district, therefore, was only 66 signatures. The plaintiffs contend that since the stipulation concedes 96 challenges [7] to previously verified signatures, unless the secretary of state is not bound by his certification and "may now increase the total number of verified signatures beyond the 66 margin" or *"unless* the Intervenor may 'rehabilitate' signatures already rejected by the county clerks in the verification process in order to add previously unverified signa-

---

**7.** The stipulation of facts presented by the litigants to the circuit court concedes a total of 96 challenges to previously verified signatures on the state petitions in the eighth congressional district. The signatures were disqualified as duplicates, forgeries and because the persons were ineligible to vote. The findings of fact entered with the judgment of the circuit court recite: "Plaintiffs seek to disqualify the signatures of one hundred and six individuals. To

the extent the signatures were not genuine or are of persons who signed the petitions more than once, who were not properly registered, who had lost the right to vote or who did not date their signatures, the challenges are allowed." We surmise that the evidence proved ten disqualifications in addition to those verified individual signatures already stipulated as disqualified.

tures to overcome that margin," the plaintiffs have met their burden of proof that the state petitions should have not been certified to the electorate.

The secretary of state, as authorized by § 116.130, sent the petition pages to the proper local election authority in each county of the eighth congressional district to verify that the persons whose names were listed as signers to the petition were registered voters. The local election authority was instructed to mark the individual signatures with an "R" according to 15 CSR § 30–15.020 to specify that the signature was of a registered voter and was genuine. Twenty five of them complied and certified their count accordingly. For some reason not known, the Perry County Clerk declined to mark signatures as valid or invalid but certified 126 signatures valid for that county. The 16,256 signatures on the state petitions certified by the secretary of state as registered voters was the sum of the counts from all twenty six counties in the eighth congressional district.

The plaintiffs applied to the circuit court of Cole County under § 116.200 to compel the secretary of state to reverse his decision to certify the petitions on the ground, among others, that in the calculation of the number of valid signatures submitted from the eighth congressional district, numerous signatures were counted as valid which the secretary of state was required to disregard and not count. These included signatures which were forged or otherwise executed by persons other than the purported signers in violation of § 116.090. The required deletions reduced the number of valid signatures from that district below the 16,190 sufficiency to qualify the petitions from that district for the ballot.

In response to the litigation, the secretary of state recounted the "R" marks on the eighth congressional district petition sheets and came to a count different from 15 of the 26 county certifications. The secretary of state counted 16,753 "R" marks that were verified by local election authorities. [See Appendix A]. The recount of 16,753 did not include any signatures from Perry County since, although the certificate of that local authority found 126 signatures valid for that county, none of them were verified by the "R" mark.

The plaintiffs contend nevertheless that they are entitled to rely on the secretary of state's certification of sufficiency issued under § 116.150 to muster their challenge, and that certification confirms that there were only 16,256 valid signatures. The plaintiffs insist that the secretary of state is bound by that certification, and therefore the sustained challenges to 106 signatures reduces the number of signatures of registered voters below that necessary to qualify the petitions from that district for the ballot.

*United Labor Comm. v. Kirkpatrick*, 572 S.W.2d 449, 453[4, 5] (Mo. banc 1973) comments: "The rationale behind the initiative amendments is that a sufficient number of registered voters deem an issue important enough that the issue should be put to a vote before the people. The assertion of this constitutional right by the required number of legal voters should not be lightly cast aside." The fundament of that constitutional process is the gathered signatures of legal voters in the requisite number. *Id.* The virtual purpose of chapter 116 is to vouchsafe the integrity of that process. *See, eg. Scott v. Kirkpatrick*, 513 S.W.2d 442; *Payne v. Kirkpatrick*, 685 S.W.2d 891. "The validity of the signatures is the heart of the ultimate determination" of the sufficiency of an initiative petition for the ballot. *United Labor Comm. v. Kirkpatrick*, 572 S.W.2d at 455.

It is the secretary of state who is charged with the ultimate administrative determination as to whether the petition complies with the Constitution of Missouri and with the statutes. §§ 116.120.1 and 116.150; *Missourians to Protect Initiative Process v. Blunt*, 799 S.W.2d 824, 828[3] (Mo. banc 1990). It is the courts who are charged with the ultimate judicial determination as to whether, under the Constitution and laws, the petition is sufficient or insufficient for the ballot. *Id.* at 828; § 116.200. That adjudication is a matter of original evidence. The petition of the plaintiffs in the Circuit Court of Cole County to

reverse the decision of the secretary of state that the initiative petition is sufficient under § 116.200, on grounds that "numerous signatures were counted which [the secretary of state] was required to disregard and not count," presented that issue for original and plenary, albeit speedy, judicial adjudication. § 116.200.1. It is that the initiative petition is *sufficient* or *insufficient* that the secretary of state certifies, and it is that ultimate question that the court adjudicates. *See* §§ 116.150; 116.-200; *Missourians to Protect Initiative Process v. Blunt,* 799 S.W.2d at 828[2, 3]. Whether or not the secretary of state may recount for valid signatures after the certification that the sufficiency of the petition has issued under § 116.150, therefore, is quite beside the point. If the signatures are present, the initiative is sufficient, and the people have the right to put the proposition on the ballot.

■ The circuit court properly postulated "the ultimate question posed by this litigation [as] whether 16,190 persons who are registered to vote within Missouri's eighth congressional district signed these petitions." The circuit court also properly postulated as the cognate question: "whether, after striking those signatures erroneously counted, enough signatures remained to qualify the petition in the eighth district." That determination was a matter of evidence in the circuit court.

The circuit court after evidence determined that there were 16,914 signatures of registered voters upon state petitions from the eighth congressional district and found, expressly, that "[t]he starting point for plaintiffs' challenges is, therefore, 16,914 signatures." The court came to that total by adding 161 signatures in Perry County to the 16,753 derived by the recount of the secretary of state. [That recount, as noted, was confined to signatures marked "R", a designation that the Perry County certified count lacked.]

The challenge by the plaintiffs to the determination by the circuit court that "the starting point for plaintiffs' challenges is 16,914 signatures" is directed to the counts from Crawford County, Perry County and

Franklin County in that tally. They argue that the signatures improperly added by the secretary of state from these counties altered a count, made insufficient by the challenges sustained as to 106 signatures, to a count that was more than the 16,190 sufficient to qualify the petitions from that district for the ballot.

The increase in the final count of the secretary of state, from 16,256 to 16,753 valid signatures of registered voters on the eighth congressional district state petitions, was essentially the result of an arithmetic error by the county clerk of Crawford County who certified 584 fewer "R" signatures than were actually on the petitions. The plaintiffs appear to argue that since the secretary of state "could not explain or account for the Crawford County discrepancy," the undercounted 584 signatures could not be used to qualify the petitions. They do not challenge, however, that the 584 signatures the secretary of state counted were not qualified.

"The people, from whom all constitutional authority is derived, have reserved the 'power to propose and enact or reject laws and amendments to the Constitution.' When courts are called upon to intervene in the initiative process, they must act with restraint, trepidation and a healthy suspicion of the partisan who would use the judiciary to prevent the initiative process from taking its course. Constitutional and statutory provisions relative to initiative are liberally construed to make effective the people's reservation of that power." *Missourians to Protect Initiative Process v. Blunt,* 799 S.W.2d at 827 (citations omitted). The constitutional right of the people to the initiative, therefore, cannot be made to depend upon the arithmetic aptitude of the public official. The plaintiffs challenge to the Crawford County count by the secretary of state was properly denied.

Perry County reported 163 as the total of signatures checked, found 37 of them invalid, and verified 126 signatures as valid for the county. The plaintiffs argue that since Perry County failed to identify the signatures on the state petition sheets by "R" marks in disregard of 15 CSR § 30–15.020,

there was no way to determine which individual signatures were of registered voters, and hence valid for the petition. They argue, therefore, that in his certification issued under § 116.150, the secretary of state mistakenly allowed the 126 signatures found valid by Perry County to stand although they could not be verified as to any identifiable registered voter.

 The signatures on the pages of an initiative petition may also be proven by reliance on the circulator's affidavit as well as by the "R" mark of the local election official. The affidavit creates a presumption of validity which can be overcome by competent evidence. *See* § 116.080; *United Labor Comm. v. Kirkpatrick,* 572 S.W.2d at 452[2, 3]. The count by the secretary of state was not unauthorized. It happens, nevertheless, that upon the evidence at the trial, the circuit court determined that 161 of the 163 signatures on the petition sheets were supported by the circulators' affidavits, and so entitled to presumptive validity. The claim that Marion Porter, who circulated eight petition pages containing 82 signatures was not a properly registered voter, was rejected by the court on evidence that he had been a registered voter in Missouri throughout the period he was circulating petitions. That finding rests on substantial evidence.

The plaintiffs claim also at most only 313 signatures of the 450 state petition signatures on the Franklin County petition sheets can be verified as those of persons in the eighth congressional district, and so valid for count in that district. Franklin County lies both in the eighth and ninth congressional districts. The secretary of state offered no evidence on the issue at the trial, and the circuit court entered no finding. The reduction in the count of valid signatures by 137 does not affect the qualification for the ballot of the initiative petitions from the eighth congressional district.

The plaintiffs also seek to disqualify some 4900 signatures from the state petition because of irregularities in the circulators' affidavits. The trial court determined: "Irregularities in circulators' affidavits rebut the presumed validity of signatures proved by way of the circulators' affidavits, but do not disqualify signatures verified by way of a check of the voter registration rolls. *See United Labor Comm. v. Kirkpatrick,* 572 S.W.2d 449, 453–54 (Mo. banc 1978)." We agree with that conclusion of law and rejection of that challenge.

The intervenor Missourians for Limited Terms undertook to prove by voter registration cards and the expert testimony of a handwriting expert that several election authorities wrongly rejected signatures that should have been allowed. The plaintiffs argue, among other things, that such proof was insufficient to overcome the finding by the local election authority of non-registration of the signatory at the time the signature was affixed to the petition. The circuit court did not rule the issues, and properly so. Whatever the merit of any argument as to the excluded signatures, the evidence before the court proved prima facie 16,914 valid signatures on the state term limits petitions for the eighth congressional district. The reduction in that count by the 106 signatures found not valid and the 137 signatures from Franklin County not identified as from registered voters in the eighth congressional district does not affect the qualification for the ballot of the initiative petitions from the eighth congressional district.

There remain on the state petitions 16,-671 valid signatures, an excess above the 16,109 margin of sufficiency. There remain on the federal petitions 16,865[8] valid signatures, an excess above the 16,109 margin of sufficiency. The state and federal term limits initiative qualify for the ballot on the basis of valid signatures collected from the eighth congressional district.

---

**8.** The parties stipulated that the local election authorities certified 16,966 signatures on the federal petitions as those of qualified, registered voters. The court allowed challenges to 101 individual signatures for essentially the same reasons as for the challenges to the state petitions.

The plaintiffs also raise two questions with regard to the substance of the federal term limits proposal.[9] They contend that the effective date clause of the proposal, which does not take effect until "one-half of the states enact term limits," violates the requirements of immediate effectiveness for constitutional amendments as set out in Article 3, § 51 and Article 12, §§ 1 and 2(b) of the Constitution of Missouri. They contend also that the proposal delegates the power to amend this state's constitution to other states in violation of Article 1, §§ 1 and 3, and is otherwise excessively vague and ambiguous in violation of Article 1, § 10 of the Constitution of Missouri. The plaintiffs urged the court to declare the federal initiative proposal unconstitutional and to order it removed from the ballot.

The court ruled that the challenges posed by the plaintiffs did not touch upon "the constitutional requisites for putting an initiative on the ballot," but upon "the effectiveness of the language of the initiative." That is to say, the challenges did not address the validity of the procedures used to put the proposal to the people, but to the merits of its substance. The court determined that "[b]ecause the challenge may be brought at a later date, there is no reason to decide the matter at this point." The court ruled that the issues were not ripe for adjudication, and refused to respond to the merits of the contentions.

The plaintiffs acknowledge that they challenge the substance of the federal term limits proposal as a valid initiative amendment under the Missouri Constitution. They cite *Missourians to Protect Initiative Process v. Blunt*, 799 S.W.2d 824, as precedent for the propriety of a court to determine substantive issues of the constitutional validity of an initiative amendment prior to the election on the proposal. The question before *Blunt* was whether the proposed constitutional amendment violated the requirement of Article 3, § 50 that an initiative petition "shall not contain more than one subject and matters proper-

ly connected therewith." It was the argument that a court was without jurisdiction prior to the election to reach the merits of the claim that the initiative petition contained more than one subject. *Id.* at 827. More precisely, the argument was "that substantive defects in initiative proposals may only be raised after the election, and that a claim of multiple subjects is substantive." *Id.*

*Blunt* answered: "The dichotomy between procedural defects in the initiative process and substantive defects is not found in the language of the constitution or the statutes." *Id.* at 828. To the argument that the case law prohibited the secretary of state from considering matters other than the sufficiency of the signatures, the court responded with the express provisions of Article 3, § 50 and § 116.120. Article 3, § 50, as noted, provides among other prerequisites, that an initiative petition to amend the constitution "shall not contain more than one subject and matters properly connected therewith." Section 116.120 charges the secretary of state to determine whether an initiative petition "complies with the Constitution of Missouri and with this chapter." The court concluded that, at minimum, the statute requires the secretary of state to examine the petition to insure that the threshold requirements of article 3, § 50 are met. "That necessarily requires the Secretary of State to examine the proposal to insure it does not contain multiple subjects." *Id.* at 828[3].

*Blunt* does not, contrary to argument, establish "beyond any doubt the propriety of determining substantive issues of the validity of a proposed amendment under the Constitution of Missouri prior to the election in the certified initiative proposal." It establishes, rather, that "Any controversy as to whether the prerequisites of article 3, § 50 have been met is ripe for judicial determination when the Secretary of State makes a decision to submit, or refuse to submit, an initiative issue to the voters. At that point, a judicial opinion as to whether

---

**9.** The initiative proposal for limiting the terms of Missouri's federal legislators is rescripted as

Appendix B.

the constitutional requirements have been met is no longer hypothetical or advisory." *Id.* at 828[2].

The issues that the plaintiffs assert to challenge the constitutional validity of the federal term limits petition have nothing to do with the prerequisites of article 3, § 50 of the constitution. The challenge of the plaintiffs that those prerequisites were not met has already been denied by the circuit court. The circuit court has adjudged that the state and federal term limits initiatives are legally sufficient as to any challenged prerequisites, and so ready for the ballot. It is a judgment we affirm by this opinion. The challenge of the plaintiffs, rather, invites the court to "look behind the face of the petition to determine its constitutionality prior to its being voted on by the electorate." *Union Elec. Co. v. Kirkpatrick*, 678 S.W.2d 402, 405[2–4] (Mo. banc 1984). It

poses, in plaintiffs' idiom, "substantive issues of the validity of a proposed initiative amendment under the Constitution of Missouri prior to the decision on the certified initiative proposal." The circuit court properly refused to reach the merits of the "substantive issues" of the constitutionality of the initiative proposal as not ripe for adjudication. Those challenges may be brought after the initiative proposal, certified as adopted, has become an amendment to the constitution. *State ex rel. Dahl v. Lange*, 661 S.W.2d 7, 8 (Mo. banc 1983).

The judgment of the circuit court is affirmed. The state and federal term limits initiatives are legally sufficient under Article 3 of the Missouri Constitution and Chapter 116, RSMo.

All concur.

APPENDIX A

| COUNTY | LOCAL REPORT | "R" SECRETARY |
|---|---|---|
| BOLLINGER | 171 | 171 |
| BUTLER | 626 | 626 |
| CAPE GIRARDEAU | 2473 | 2476 |
| CARTER | 65 | 66 |
| CRAWFORD | 1032 | 1616 |
| DENT | 1574 | 1591 |
| DUNKLIN | 93 | 93 |
| FRANKLIN | 450 | 456 |
| HOWELL | 2577 | 2583 |
| IRON | 39 | 39 |
| MADISON | 381 | 382 |
| MISSISSIPPI | 247 | 247 |
| NEW MADRID | 445 | 427 |
| OREGON | 245 | 257 |
| PEMISCOT | 9 | 9 |
| PERRY | 126 | NOT MARKED |
| PHELPS | 1824 | 1833 |
| REYNOLDS | 240 | 240 |
| RIPLEY | 31 | 31 |
| ST. FRANCOIS | 483 | 484 |
| STE. GENEVIEVE | 39 | 39 |
| SCOTT | 1342 | 1349 |
| SHANNON | 904 | 903 |
| STODDARD | 515 | 509 |
| WASHINGTON | 264 | 265 |
| WAYNE | 61 | 61 |
| TOTALS | 16256 | 16753 |

APPENDIX B

"BE IT RESOLVED BY THE PEOPLE OF THE STATE OF MISSOURI that the Constitution be Amended; By adding the following new section 45(a) to Article III:

Section 45(a):(1) No United States Senator from Missouri shall serve more than two terms in the United States Senate, and no United States Representative rrom Missouri shall serve more than four terms in the United States House of Representatives. This limitation on the number of terms shall apply to terms of office beginning on or after the effective date of this section. Any person appointed or elected to fill a vacancy in the United States Congress and who serves at least one-half of a term of office shall be considered to have served a term in that office for purposes of this subsection (1). The provisions of this subsection (1) shall become effective whenever at least one-half of the states enact term limits for their members of the United States Congress.

(2) The people of Missouri declare that the provision of this section shall be deemed severable and that their intention is that federal officials elected from Missouri will continue voluntarily to observe the wishes of the people as stated in the section in the event any provision thereof is held invalid."